996 A.2d 1040 (2010)
413 N.J. Super. 504
DEPARTMENT OF CHILDREN AND FAMILIES, DIVISION OF YOUTH AND FAMILY SERVICES, Plaintiff-Respondent,
v.
K.A., Defendant-Appellant.
DOCKET NO. A-2537-08T3.
Superior Court of New Jersey, Appellate Division.
Submitted February 23, 2010.
Decided June 2, 2010.
John J. Palitto, Jr., Blackwood, for appellant.
Paula T. Dow, Acting Attorney General, for respondent (Lewis A. Scheindlin, Assistant Attorney General, of counsel; Rebecca Glick, Deputy Attorney General, on the brief).
Before Judges SKILLMAN, FUENTES and SIMONELLI.
The opinion of the court was delivered by
FUENTES, J.A.D.
K.A. appeals from the final determination of the Director of the Division of Youth and Family Services (Division or DYFS) that found sufficient grounds to substantiate allegations of abuse or neglect against K.A. involving her eight-year-old daughter A.A. We reverse.
We derive the following facts from the record developed before the Administrative *1041 Law Judge (ALJ) assigned to this case.

I
The incident that gave rise to the Division's intervention occurred on October 3, 2006. On that day, K.A. was helping her daughter, A.A., with her homework after the child returned from school. A.A. would not obey her mother's instructions to complete her homework, so K.A. sent A.A. to her room for a time-out. A.A. refused to stay inside her room during the time-out, however, leaving her room several times in defiance of her mother's instructions. In an effort to address her daughter's disobedience, K.A. struck her four or five times on the shoulder with a closed fist and sent A.A. back to her room. The episode lasted only four to five seconds. At the time of the incident, A.A. was eight years-old and had been diagnosed with pervasive development disorder and attention deficient disorder. The child took medication for the latter condition.
On October 5, 2006, a classroom aide at A.A.'s school noticed a bruise on A.A.'s shoulder, which the aide described as a "paw print," one round bruise with several smaller dotted bruises above it. When asked how she got the bruise, A.A. responded that her mother had hit her. The classroom aide notified the school's principal who, in turn, contacted DYFS.
DYFS assigned caseworker Maia Adelman to investigate the matter. Adelman interviewed A.A. and K.A. that afternoon at their home. In her report, Adelman noted that A.A. "was extremely difficult to interview, as she would not sit still and would not answer most of [her] questions. [A.A.] only wanted [Adelman] to play a game with her and [became] angry when [Adelman] continued to try to just talk to her." At some point during the interview, Adelman observed the bruises on A.A.'s shoulder, which she described as "four quarter-sized bruises and one 1/2 dollar-sized bruise on [A.A.'s] left shoulder blade" that were "slightly darker in color then [A.A.'s] complexion, which was tanned due to her Indian descent."
When Adelman interviewed K.A. she "was sobbing throughout the interview" and admitted to hitting her daughter with a closed fist approximately four or five times a few days earlier. K.A. explained that A.A. was not listening to her on the date of the incident and refused to stay in her room for a time-out. She also told the caseworker that she was very stressed and overwhelmed in caring for A.A. because A.A.'s father worked until approximately nine o'clock in the evening and then took work calls from India until midnight every night. K.A. also told Adelman that all of her family members reside in India and that she had not formed any friendships in this country.
After the interview, K.A. agreed to participate in various family services provided by the Division. She attended therapy sessions, went to meditation, and exercised at a gym. In addition to these efforts by K.A., the child's father changed his work schedule so that he could be at home to help K.A. with A.A.'s care. DYFS noted a remarkable change in the family within a few weeks.
At the hearing before the ALJ, the parties stipulated to the following facts:
1) At the time in question, A.A. attended Larchmont Elementary School in October 2006.
2) The A. family resided in Mount Laurel in October of 2006 and consists of mother ... [K.A.], [age 33 at the time,] Father, R.A., [age 38 at the time], and child, [A.A.], [age 8 at the time].
3) The family came to the U.S. from India when [A.A.] was 18 months-old.

*1042 4) Maia Adelman was the caseworker assigned to the case from the Burlington local office.
5) The incident occurred on or about October 3, 2006, and was reported to the Division of Youth and Family Services, or DYFS, on October 5, 2006.
6) On October 5, 2006, an aide at the school noticed the bruising on [A.A.'s] arm when her sweater fell off her shoulder.
7) The school principal made the referral to DYFS by phone on October 5, 2006.
8) The caseworker interviewed Mrs. A. and [A.A.] on October 5, 2006, and Mr. A. approximately one week later.
9) [A.A.] was eight years-old at the time of the incident.
10) The previous year [A.A.] was classified autistic but was relatively high functioning.
11) [A.A.] has been diagnosed with pervasive development disorder not otherwise specified.
12) At the time of the incident, Mrs. A. was a stay-at-home mom and Mr. A. worked long hours and was not available to help much with the day-to-day care of [A.A.]
13) On the day of the incident, Mrs. A. sent [A.A.] to her room for a time-out for refusing to do her homework but [A.A.] would not stay in her room.
14) Mrs. A. admitted she usually used an open hand to discipline [A.A.] but [A.A.] was not responding to that so she used a closed fist this time.
15) Mrs. A. hit her daughter [A.A.] four to five times with a closed fist on the shoulder for disciplinary purposes.
16) Mrs. A. was immediately remorseful.
17) On October 31, 2006, M.A. substantiated abuse against Mrs. A. after she admitted she hit her daughter, [A.A.], four to five times with a closed fist on her left shoulder blade. [A.A.] sustained bruises.
18) The Division put services in place such as family preservation and additional services to help with parenting and discipline, as well as [enrolling A.A.] in value options to help with behavior modification. Vast improvements occurred quickly with the family.
Citing In re Allegations of Sexual Abuse at East Park High School, 314 N.J.Super. 149, 154, 714 A.2d 339 (App.Div.1998), and New Jersey Division of Youth and Family Services v. M.R., 314 N.J.Super. 390, 411-25, 715 A.2d 308 (App.Div.1998), the ALJ found that the Division had not met its burden of proving, by a preponderance of the credible evidence, that K.A. used excessive corporal punishment when she struck her daughter on the shoulder on October 3, 2006. The ALJ determined that
[c]orporal punishment of a child by a parent is not a crime in New Jersey. However, excessive corporal punishment of a child by a parent is child abuse in New Jersey. A parent attempting to control by hitting a disobeying child, even with bruising resulting, does not rise to substantial injury, imminent danger, or excessive corporal punishment or protracted injury.
In rejecting the findings of the ALJ, the Director noted that "the act of repeatedly hitting a child with a closed fist, with sufficient force to leave bruises still visible more than a day later, does certainly qualify as abuse per N.J.S.A. 9:6-8.21(c)(4)(b)[.]" In reaching this conclusion, the Director cited to the DYFS Policy and Procedures Manual, which defines "child abuse" as physical injury "due to a parent's/caregiver's action or inaction that was neither necessary nor justified, neither *1043 reasonable nor appropriate." The Director further noted that the Manual states that "a single incident may be enough to indicate abuse and corporal punishment is defined as `any punishment inflicted on the body.'"
Finally, the Director took specific exception to the ALJ's consideration of certain factors surrounding the incident:
The factors which the ALJ considered in ruling on this case, i.e., K.A.'s remorse, the reasons for her actions, the isolation of the incident, the trying circumstances which K.A. was undergoing due to A.A.'s psychological disorder, and her lack of family support available to assist her in dealing with the situation, are not relevant to a determination of whether the finding of substantiated abuse should be affirmed.

[(Emphasis added).]
On appeal to this court, K.A. argues that the Director's decision was arbitrary, capricious, and unreasonable. According to K.A., the record does not support the Director's finding that her actions impaired her daughter's physical condition.

II
In reviewing final decisions of a State administrative agency we must "defer to an agency's expertise and superior knowledge of a particular field." Greenwood v. State Police Training Ctr., 127 N.J. 500, 513, 606 A.2d 336 (1992). We are thus bound to uphold the agency's decision "unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." In re Herrmann, 192 N.J. 19, 27-28, 926 A.2d 350 (2007). That being said, "our appellate obligation requires more than a perfunctory review." Blackwell v. Dep't of Corr., 348 N.J.Super. 117, 123, 791 A.2d 310 (App.Div.2002). We are required to engage in a "careful and principled consideration of the agency record and findings[.]" Mayflower Sec. Co. v. Bureau of Sec., 64 N.J. 85, 93, 312 A.2d 497 (1973).
"`[A]n administrative agency's interpretation of statutes and regulations within its implementing and enforcing responsibility is ordinarily entitled to our deference.'" Wnuck v. N.J. Div. of Motor Vehicles, 337 N.J.Super. 52, 56, 766 A.2d 312 (App.Div.2001) (quoting In re Appeal by Progressive Cas. Ins. Co., 307 N.J.Super. 93, 102, 704 A.2d 562 (App.Div.1997)). Nonetheless, that deference is tempered by the well-established principle that an agency's legal interpretation is in no way binding on us. In re Carter, 191 N.J. 474, 483, 924 A.2d 525 (2007).
Here, K.A. challenges the Director's legal conclusion that, under the circumstances of this case, striking a child several times with a closed fist that results in visible bruising amounts to excessive corporal punishment under N.J.S.A. 9:6-8.21. Under this statute, an abused or neglected child means a child under the age of 18
whose parent or guardian ... inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ; ... or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired [by a parent] ... by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment....
[N.J.S.A. 9:6-8.21c(1),(4)(b) (emphasis added).]
*1044 A determination of abuse must be shown by a preponderance of the evidence during a fact-finding hearing. N.J.S.A. 9:6-8.46b; N.J. Div. of Youth & Family Servs. v. K.M., 136 N.J. 546, 552, 643 A.2d 987 (1994).
"Excessive corporal punishment" is not specifically defined in Title Nine. However, this court has approved of the following charge to be used in a trial where this offense is submitted to the jury for its determination: "The law does not prohibit the use of corporal punishment. The statute prohibits the infliction of excessive corporal punishment. The general proposition is that a parent may inflict moderate correction such as is reasonable under the circumstances of a case." State v. T.C., 347 N.J.Super. 219, 239-40, 789 A.2d 173 (App.Div.2002), certif. denied, 177 N.J. 222, 827 A.2d 289 (2003).
The administrative code provides additional guidance by listing injuries which may constitute abuse and/or neglect:
(a) The allegations of the types of injuries or risk or harm that may be abuse or neglect include:
1. Child death;
2. Head injuries;
3. Internal injuries;
4. Burns;
5. Poison or noxious substances;
6. Wounds;
7. Bone fractures;
8. Substantial risk of physical injury or environment injurious to health and welfare;
9. Cuts, bruises, abrasions, welts or oral injuries;
10. Human bites;
11. Sprains or dislocations;
12. Mental or emotional impairment; and
13. Risk of harm due to substance abuse by the parent/caregiver or the child.
(b) The allegations of the types of injuries or risk or harm that may be abuse include:
1. Torture;
2. Tying or close confinement;
3. Sexually transmitted diseases;
4. Sexual penetration;
5. Sexual exploitation;
6. Sexual molestation; and
7. Substantial risk of sexual injury.
[N.J.A.C. 10:129-2.2.]
With these administrative categories in mind, we evaluate a claim of abuse by looking to the harm suffered by the child, rather than the mental state of the accused abuser, because "[t]he main goal of Title 9 is to protect children[.]" G.S. v. Dep't of Human Servs., 157 N.J. 161, 176, 723 A.2d 612 (1999).
The parties have not cited, and we have not found, any reported decision in this State defining the term "excessive corporal punishment." Thus, absent statutory, regulatory, or case law guidance, we will define "excessive corporal punishment" by referring to common usage and understanding. As a starting point, we note that the statute condemns excessive corporal punishment. The term "excessive" means going beyond what is proper or reasonable. Webster's II New College Dictionary 390 (Margery S. Berube ed., 1995). We agree with the Director that a single incident of violence against a child may be sufficient to constitute excessive corporal punishment. A situation where the child suffers a fracture of a limb, or a serious laceration, or any other event where medical intervention proves to be necessary, may be sufficient to sustain a finding of excessive corporal punishment, provided that the parent or caregiver could have *1045 foreseen, under all of the attendant circumstances, that such harm could result from the punishment inflicted.
In this case, however, the force used did not lacerate the child's skin and did not require any type of medical intervention. Bruises, although visible, never exposed A.A. to any further harm if left untreated. Thus, absent evidence showing that the inflicted injury constitutes per se excessive corporal punishment, we must examine the circumstances facing K.A. to determine whether striking A.A. five times on the shoulder with a closed fist amounted to excessive corporal punishment.
In making this evaluation, we reject the Director's characterization as "irrelevant:" (1) the reasons underlying K.A.'s actions; (2) the isolation of the incident; and (3) the trying circumstances which K.A. was undergoing due to A.A.'s psychological disorder. These factors form the prism through which we determine whether K.A.'s actions were indeed "excessive." After all, common sense dictates that if K.A. had done what she did here in response to A.A.'s request for a glass of water or to stay up past her bedtime, no reasonable person would dispute that her actions were "excessive."
K.A. was confronted with a psychologically disruptive child, unable or unwilling to follow verbal instructions or adhere to passive means of discipline such as a time-out. K.A. was alone, without support from either her spouse/co-parent or from other members of her extended family, such as an experienced mother or aunt. Out of sheer frustration, or through an ill-advised impulse, she struck her child five times. These blows, though undoubtedly painful, did not cause the child any permanent harm, did not require medical intervention of any kind, and were not part of a pattern of abuse.
K.A. accepted full responsibility for her actions, was contrite, and complied with Division-sponsored counseling. K.A.'s spouse changed his work schedule and is now engaged in his daughter's rearing as an equal partner. By the Division's own account, the situation improved significantly after this isolated event and there was no need for continued Division involvement. By any reasonable measure, this is the type of incident that appears to be aberrational to this family. The Division did not at any time believe that removal of the child was necessary to protect her from further harm. Under all of these circumstances, labeling K.A. a child abuser is factually unwarranted and legally unsustainable.[1]
Reversed.
NOTES
[1] Although not directly before us, we note that the only purpose in labeling K.A. as a child abuser at this time appears to be to keep her name in the Central Registry of Abuse/Neglect Perpetrators. Div. of Youth & Family Servs. v. D.F., 377 N.J.Super. 59, 67, 871 A.2d 699 (App.Div.2005). In light of our decision, we expect DYFS to take the steps necessary to remove her name from the Registry forthwith. Unwarranted inclusion of K.A. in the Registry would cause severe and irreparable injury to her good name and character.