**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R.1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5159-14T3

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

N.B.,

    Defendant-Appellant,

and

B.S., E.R. and T.J.D.,

    Defendants.

_____

IN THE MATTER OF T.B. and E.R.,

    Minors.

_____

        Submitted October 6, 2016 — Decided May 10, 2017

        Before Judges Alvarez and Accurso.

        On appeal from Superior Court of New Jersey,
        Chancery Division, Family Part, Camden
        County, Docket No. FN-04-343-15.

Joseph E. Krakora, Public Defender, attorney for appellant (Joan T. Buckley, Designated Counsel, on the brief).

Christopher S. Porrino, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; William T. Harvey, Jr., Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor T.B. (Cory H. Cassar, Designated Counsel, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor E.R. (Melissa R. Vance, Assistant Deputy Public Defender, on the brief).

PER CURIAM

Defendant N.B. appeals from a March 3, 2015 order of the Family Part, now final, that she abused and neglected her daughter E.R. (Elena)[1] by excessive corporal punishment, inflicted two weeks shy of her eighth birthday, in violation of N.J.S.A. 9:6-8.21c.  The fact finding hearing was conducted "on the papers."

We agree with the Division of Child Protection and Permanency and the Law Guardian[2] that there was evidence in the

---

[1] We refer to the children by fictitious names in order to protect their privacy.

[2] N.B. is also the mother of a son, T.B. (Tab), eleven years old at the time of this incident.  The children are represented by separate counsel here.  Although the Division did not establish

(continued)

record suggesting excessive use of corporal punishment. There was also, however, evidence that this was an isolated instance, as the Division had failed to substantiate the prior reports of excessive punishment, and that Elena had significant behavioral problems, and indeed, that at the time of this incident was in the midst of an intense tantrum. Because the record did not permit a finding of per se excessive corporal punishment, an examination of the circumstances facing N.B. was critical to determine whether her striking Elena several times with an open hand amounted to abuse or neglect. See Dep't of Children & Families, Div. of Youth & Family Servs. v. K.A., 413 N.J. Super. 504, 512 (App. Div. 2010), certif. dismissed as improvidently granted, 208 N.J. 355 (2011). As the trial court failed to adequately address those circumstances on this truncated record, we vacate the order and remand for further fact finding.

Although the record evidence here is scant, consisting of only the Division's investigation summary and expert report,

_____

(continued)
allegations of physical abuse of Tab, and the court made no findings as to the boy, the caption encompassed both children and the order refers to child(ren). The Law Guardian representing Tab on this appeal asserts the Division did not establish that Tab was an abused or neglected child. Because we are remanding this matter for further fact finding, we direct the trial court to clarify its findings as to Tab, reopening the record if necessary. References to the Law Guardian in the text refer to counsel for Elena.

both redacted to eliminate hearsay statements by Elena's grandmother, and six photographs of the child's injuries, we summarize the salient points. N.B. had her first child, Tab, three months after her sixteenth birthday. Elena was born when N.B. was nineteen. The children have different fathers. Elena's father was in prison in Pennsylvania at the time of this incident, and N.B. was living with a man, B.S., whom the Division suspected of domestic violence.[3] He was apparently recently released from jail and not employed at the time of this incident. N.B. supported the family working full-time in housekeeping at a local hotel.

Elena's paternal grandmother called the Camden County police on November 26, 2014, to report scratches and bruises she found on Elena, including one near her eye. The police came to the home, took a statement, and confirmed seeing several small bruises and scratches on the child.[4] The second-grader claimed

---

[3] When the Division interviewed N.B., she had a black eye, which she told the worker she got when she "ran into something at work." N.B. declined the worker's request to confirm the report with her employer, and reported B.S. "was mad that she got the black eye because he does not like seeing her hurt." When the worker asked B.S. about the black eye, he asked "what black eye." He told the worker he thought N.B. "was just wearing make-up on one side of her face."

[4] The police report, which the Division withdrew in the face of objections by defense counsel and thus was not admitted in
(continued)

A-5159-14T3

"she was put on punishment" the day before for not putting on play clothes when she got home from school. She reported that B.S. told her to change out of her uniform, but she wanted to get something to drink first. When she went to get her snack, she claimed B.S. smacked her in the face, and that both he and her mother hit her with an open hand, causing her to fall to the floor, after which her mother kicked her.

Tab, then in the sixth grade, claimed when he was interviewed by the Division that B.S. told Elena to put on her play clothes, but she was not listening. Instead, she went into the refrigerator to get something. B.S. put Elena "on punishment" and told her to go to her room. According to Tab, once in her room, Elena was crying and pulled the sheets off her bed and tossed her clothes around the room. Tab claimed his mother spanked Elena "on her arm and butt" using her hand, and that B.S. had not hit Elena. He denied his mother and B.S. regularly punished the children physically, instead claiming they were usually sent to their rooms when they misbehaved.

(continued)
evidence, reflects that both N.B. and B.S. were charged on a complaint summons with simple assault. Defense counsel asserted in the course of argument at the fact finding hearing, that their clients were not arrested. There is nothing in the record to establish whether defendants were or were not charged and, if so, the disposition of those charges.

B.S.'s and N.B.'s accounts of the incident largely tracked Tab's. B.S. claimed the children knew they were to change out of their school clothes as soon as they got home from school, before doing anything else. Elena wanted to get something out of the kitchen before changing her clothes, and he told her to go to her room. He told the worker Elena "started flipping out" and N.B. hit her on the butt with her hand. He denied ever physically disciplining either child and denied any physical violence in the home. B.S. also told the worker that Elena's "grandmother has been trying to get her."

N.B. told the worker that Elena was supposed to take off her uniform as soon as she got home from school. Elena did not want to do that and went upstairs whining and had a tantrum. N.B. admitted spanking Elena on her "butt and arm" with an open hand but denied hitting her in the face. According to N.B., Elena was "throwing her body all over the place" while N.B. was disciplining her. Although acknowledging that Elena's thrashing about may have resulted in the mark on her face, N.B claimed the scratch was unintentional. She also claimed not to have noticed the scratch at the time. N.B. told the worker that after the spanking, Elena calmed down and took a shower. Afterwards, the child ate her dinner and went to bed. N.B. denied that B.S. had

hit Elena, and also claimed she was the only one to discipline her.

The tantrum that apparently precipitated this action was not the only one documented in the record. The Division removed both children after the police responded to the grandmother's home. When the worker advised Elena that she would not be able to stay with her grandmother, the child became severely upset, stripping off her seatbelt and punching the inside of the car. The worker had to pull off the road into an empty parking lot to get the situation under control.[5] About a month later, when the children were still in placement, Elena's school had to transport her to Cooper University Hospital by ambulance for crisis screening. The school reported Elena was exhibiting "extreme aggression," spitting on and hitting staff. She had also tried to run out of the building. The attending doctor advised that Elena was exhibiting behavioral and not mental health issues and recommended that she receive ongoing therapy and meet with a psychiatrist.

---

[5] When the worker facilitated a call between Elena and her mother in an effort to calm the child, B.S. got on the phone and told her "this is what happens when you run your mouth." He also told the child her grandmother "was trying to brainwash her and this is the shit that happens." When Tab later wanted to speak to his mother, the worker arranged the call but told N.B. that B.S. could not speak to Tab as he had spoken to Elena.

A-5159-14T3

Tab had been suspended from school for fighting the week before Elena was taken for crisis screening. His school advised he often gets into verbal and physical disputes with classmates and that he initiated the contact. Tab also had a disturbing history of acting out sexually, which predated the incident at issue here by two years, including a report of inappropriate contact with his sister in 2012. Following a report in 2013 that Tab had penetrated another boy with his penis, the Division had Tab evaluated at the CARES Institute. CARES recommended the boy have a psychological evaluation to determine if he was a risk to other children. The Division closed that case at intake and advised N.B. to follow-up with a psychological evaluation of her son.

At the fact finding hearing, the parties agreed to proceed "on the papers." The Division offered the Division's investigation summary, its expert's report, six photographs of Elena, along with a stipulation that the photographs accurately reflect the bruises and scratches to the child at the time the photographs were taken, and the police report. In a protracted colloquy, counsel for defendants objected to the admission of the grandmother's hearsay statements embedded in the investigation summary and the expert's report, as well as to the entirety of the police report. The judge admitted the

investigation summary and the expert report, redacting the grandmother's statements and the Division withdrew the police report.

After hearing the argument of all counsel, the judge determined the Division had failed to establish its case as to B.S., terming the evidence "weak and inconsistent." As to N.B., however, the judge found,

> number one, we have an expert report that indicates that there's excessive corporal punishment. It's described here in a full appropriate report. The court adopts the findings [in the report] as uncontroverted. . . . [C]learly . . . they are of the opinion that there was excessive corporal punishment here. And the court is satisfied that the CARES report is substantially relevant to the court's findings.

Turning to the photographs in evidence, the judge found marks on the child's arm, back and a "scratch that's basically been stipulated to[,] [which] is maybe an inch from the child's eye." Stating "the greatest injury of concern to this court is the injury on the face," the judge noted that N.B., while disavowing any purposeful intent to inflict the scratch, "does indicate that she may have caused that injury." The judge found that even accepting N.B.'s account, her "description here would formulate a finding under the gross negligence determination; gross[] negligence would cause that type of injury."

Acknowledging that N.B. "had a difficult time in imposing physical discipline on the child when the child was not cooperating with the physical discipline," the judge allowed that "may have caused injuries other than where she intended the injuries to go."  Nevertheless, the judge concluded:

> Well the problem here is that when the child is not cooperating, and the child is out of control, this may not be the time to be spanking the child.  The injuries are on the arm and that's pretty far from the area that usually is considered an area where people spank someone.  Either the child was completely out of control and [N.B.] was just wildly imposing her hands to discipline the child.  This I find not to be an appropriate time to discipline if the child is that far out of control where [N.B.] can't even impose any physical discipline in an appropriate area.  Again, it's the lower back but clearly not anyplace else.  And there are two clear scratches, or it almost looks like a belt on the child's, I guess that's the left arm.[6]  And then there is a bruise on the right arm, and again another photograph that seems to be another bruise on the right arm.  I'm not sure about that one photograph, but clearly the court sees bruises on the child's right arm, the back, the left hand, and the child's face, approximately an inch from the eye.
>
> If you are disciplining the child and have to do that and cause an injury an inch from the eye, I find that is clearly a gross[ly] negligent act, an act that is well

---

[6] There was no suggestion anywhere in the record that N.B. had used a belt to strike Elena.

within the statute of <u>N.J.S.A.</u> 9:6-8.21c(4)(b). And the cite for the closed fist on the shoulder case, <u>K.A.</u>, that's 413 <u>N.J. Super.</u> at page 506. The court finds that these are the relevant case law[7] and makes a finding that this is abuse and neglect under Title 9 and the court will sustain that finding with respect to [N.B.] at this time.

A disposition hearing was conducted immediately after the conclusion of the fact finding hearing, and the children were returned to N.B.'s custody with services to be put in place. The Title 9 action was closed three months later, on June 10, 2015, a little over six months after the initial referral, pursuant to a consent order reciting "conditions [had] been remediated."

Our role in reviewing a decision that a parent abused or neglected a child is to determine whether the trial court's findings in support of that decision are grounded in adequate, substantial, and credible evidence in the record. <u>N.J. Div. of Youth & Family Servs. v. Z.P.R.</u>, 351 <u>N.J. Super.</u> 427, 433 (App. Div. 2002). Title 9 defines an "abused or neglected child" as including

a child whose physical, mental, or emotional condition has been impaired or is in

---

[7] Earlier in its opinion, the trial court distinguished this matter from <u>N.J. Div. of Youth & Family Servs. v. P.W.R.</u>, 205 <u>N.J.</u> 17 (2011), on the basis of Elena's age.

A-5159-14T3

> imminent danger of becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care . . . (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment . . . .
>
> [N.J.S.A. 9:6-8.21c(4)(b).]

Although "excessive corporal punishment" is not defined, the Supreme Court has noted that "by qualifying the prohibition with the term, 'excessive,' the statutory language plainly recognizes the need for some parental autonomy in the child-rearing dynamic that, of necessity, may involve the need for punishment." N.J. Div. of Youth & Family Servs. v. P.W.R., 205 N.J. 17, 36 (2011). Determining when corporal punishment has become "excessive" is often a difficult and exquisitely fact-sensitive endeavor. Id. at 33.

We have not hesitated to acknowledge that even an isolated parental act that results in a child suffering a fracture, a serious laceration, or any other injury necessitating medical intervention could readily constitute excessive corporal punishment. K.A., supra, 413 N.J. Super. at 511. In the absence of such per se examples of excessiveness, however, an examination of all of the circumstances confronting the parent

is imperative, especially if the incident appears an isolated one. Id. at 511-13.

N.B. alleges the trial judge failed to consider the totality of the circumstances attendant to her spanking Elena in the midst of the child's tantrum, including that "the marks on [Elena] were superficial and required no medical attention; that [N.B.] used her plain open hand to spank; that this was an isolated incident, with no prior substantiated Division referrals; and it was [Elena's paternal grandmother], a person having a strained relationship with [N.B.], who initiated the Division referral." We agree that all of these considerations were relevant in considering whether N.B. employed excessive corporal punishment in disciplining Elena on November 25, 2014, and, judging from his opinion from the bench, that the judge appears not to have weighed any of them. Accordingly, because Elena's injuries did not constitute a per se example of excessive corporal punishment, and the judge did not identify and weigh the importance of the surrounding circumstances, we agree with N.B. that the order must be vacated. The point she raises about Elena's grandmother, however, requires some additional comment.

In a Title 9 case, the Division has to "prove that the child is 'abused or neglected' by a preponderance of the

evidence, and only through the admission of 'competent, material and relevant evidence.'" P.W.R., supra, 205 N.J. at 32 (quoting N.J.S.A. 9:6-8.46b). By virtue of the governing statute, however, such evidence may include "any writing, record or photograph . . . made as a memorandum or record of any condition, act, transaction, occurrence or event relating to a child in an abuse or neglect proceeding of any hospital or any other public or private institution or agency," provided it meets the specified admissibility requirements. N.J.S.A. 9:6-8.46a(3); see P.W.R., supra, 205 N.J. at 32.

The statute further provides that "previous statements made by the child relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact finding of abuse or neglect." N.J.S.A. 9:6-8.46a(4). We have held the "corroborative evidence need not relate directly to the alleged abuser, it need only provide support for the out-of-court statements." Z.P.R., supra, 351 N.J. Super. at 436.

Rule 5:12-4(d) permits the Division "to submit into evidence, pursuant to N.J.R.E. 803(c)(6) and 801(d), reports by staff personnel or professional consultants." Rule 803(c)(6) in turn, is subject to the constraints of N.J.R.E. 808 mandating the exclusion of certain complex expert opinions contained in

written reports unless the trial judge finds the circumstances involved in the making of the report and the likelihood of accuracy of the opinion tend to establish its trustworthiness. See N.J. Div. of Youth & Family Servs. v. B.M., 413 N.J. Super. 118, 129-30 (App. Div. 2010). Conclusions drawn from the facts included in reports by the Division's staff or professional consultants "shall be treated as prima facie evidence, subject to rebuttal." R. 5:12-4(d).

The Division, and ultimately the judge, relied heavily on the report of Dr. Martin Finkel, Professor of Pediatrics and Medical Director of Rowan University's CARES Institute, to establish that Elena was an abused and neglected child. Dr. Finkel concluded that "[t]he historical information that has been provided clearly details [Elena] experiencing inappropriate and excessive physical discipline, as she described, by her mother, mom's boyfriend [B.S.], [the maternal] grandma and the maternal grandmother's husband, the step-grandfather." The problem is that Dr. Finkel did not testify, and his report was admitted only after redacting the hearsay statements attributed to Elena's paternal grandmother.

Those redactions gutted the report. Dr. Finkel does not reference having reviewed any documents in connection with his examination of Elena, including the photographs of the child

admitted in evidence.[8]  What the doctor knew of Elena and her family was drawn entirely from the history provided by the paternal grandmother and from the child's statements to him in the course of his examination.  The statements attributed to the grandmother in the report detail an extensive history of corporal punishment of Elena by both N.B. and B.S.  Although Dr. Finkel apparently did not discuss with Elena the discipline she received on November 25, 2014, which precipitated this action, the child reported that her mother hit her frequently with "[a] belt or her hands" and that B.S. also hit the children using his hands.

N.B. argues that "[a]fter agreeing with [N.B.'s] objection to [the grandmother's] untrustworthy hearsay" and with "little other credible evidence showing that [N.B.] had inflicted excessive corporal punishment" on Elena in the documents the Division submitted, the trial court's "decision to admit and

---

[8] Although in his report, the doctor states, "I reviewed [Elena's] past medical history," it appears from the context that he reviewed Elena's medical history with her grandmother, not that he reviewed the child's medical records. As to the photographs, there are entries in the investigation summary documenting the worker emailing copies of the photographs to Dr. Finkel's office, but they post-date the doctor's report.  In his report, Dr. Finkel writes that "[i]f there are available images that demonstrate acute signs of injury that reflect the use of an object such as a hand or belt or any other implement, I would be pleased to review such images."

rely on the expert's conclusion of excessive corporal punishment was a serious mistake." The Division counters that the invited error doctrine precludes N.B. from arguing the court erred in relying on the CARES report by failing to object to the admission of the redacted report at trial. See N.J. Div. of Youth & Family Servs. v. M.C. III, 201 N.J. 328, 340-41 (2010).

Under the circumstances, we cannot agree the doctrine of invited error should apply here. The Division is certainly correct that trial counsel did not make the argument the defense does on appeal, that the report, based as it was on the grandmother's "untrustworthy hearsay," should not have been admitted under N.J.R.E. 803(c)(6) or 808. Trial counsel did, however, argue for the hearsay redactions in the CARES report, which led, ineluctably, to questions about the report's reliability, which neither the parties nor the court addressed. See N.J. Div. of Youth & Family Servs. v. M.G., 427 N.J. Super. 154, 174 (App. Div. 2012) (noting that "when the expert is not produced as a witness, the rule [N.J.R.E. 808] requires the exclusion of his or her expert opinion, even if contained in a business record, unless the trial judge makes specific findings regarding trustworthiness").

More to the point, in our view, is the Law Guardian's comment acknowledging the concern we have expressed recently

about fact finding hearings being conducted on the papers. <u>See</u>
<u>N.J. Div. of Child Prot. & Permanency v. S.W. (In re Al. W.)</u>,
448 <u>N.J. Super.</u> 180, 182-83 (App. Div. 2017). In a footnote to
her brief, the Law Guardian stresses "that defendants often make
a strategic decision to agree that the matter be done on the
papers but then raise the issue on appeal."

We do not doubt such sandbagging occurs. We express no
opinion as to whether it occurred here. We note only that the
redactions to the expert's report should have alerted everyone
to the problem with its trustworthiness under <u>N.J.R.E.</u> 808 in
the absence of the doctor's testimony.

As we have already noted, because the doctor did not review
any records or see the photographs of Elena's injuries, his
report was based almost entirely on what Elena and her
grandmother told him. Elena's statements about being hit by her
mother and B.S. were corroborated in part by the history
provided by her grandmother. If the grandmother was an
unreliable reporter, the likelihood that the expert's opinion
was accurate and trustworthy was likely nil. Those
circumstances militated against admission of the expert report
without the expert appearing and being subject to cross-
examination to explain why he found the information provided to

him to be the type on which he would ordinarily rely.  See M.G., supra, 427 N.J. Super. at 173-75.

Defendants maintained Elena's grandmother was ill-motivated by her dislike of N.B.'s boyfriend, B.S., and her desire to gain custody of Elena.  The grandmother presented herself as motivated solely by N.B. and her children's best interests. According to her, she and N.B. had been very close until N.B. began seeing more of B.S. after he was released from jail.  The grandmother claimed B.S. cut off N.B. from friends and family and restricted the grandmother's ability to speak with N.B. alone.  She also claimed that N.B. confided in her that B.S. was abusive.

Whether the grandmother was well or badly motivated and whether she was an accurate or inaccurate historian with regard to Elena's care is obviously disputed and impossible to resolve on this record.  Resolution of that issue was important because she provided the facts underpinning the expert's opinion, which, because it was admitted without the expert testifying, could not be tested through cross-examination.  Even were the expert to have testified, the court may well have needed to hear from the grandmother herself to determine the weight to be accorded to the expert's opinion.

An abuse or neglect proceeding implicates a parent's substantial rights. Thus "it is of great importance that the evidence upon which judgment is based be as reliable as the circumstances permit and that the answering parent be given the fullest possible opportunity to test the reliability of the [Division's] essential evidence by cross-examination." In re Guardianship of Cope, 106 N.J. Super. 336, 343 (App. Div. 1969).

Because the photographs did not provide evidence of a per se example of excessive corporal punishment, it was incumbent on the court to identify and weigh the importance of all the circumstances surrounding the discipline, see K.A., supra, 413 N.J. Super. at 511-12, especially in light of its conclusion that N.B.'s actions were grossly negligent, see Dep't of Children & Families, Div. of Youth & Family Servs. v. T.B., 207 N.J. 294, 309 (2011). While there was evidence in this record to suggest that N.B. engaged in excessive corporal punishment of Elena, without the testimony of live witnesses, the Division's evidence, including its redacted expert report, was inadequate to supply the court with the necessary information on which to base a finding of abuse and neglect.

Accordingly, we vacate the order of March 3, 2015 and remand for a testimonial fact finding hearing. The Division is directed to remove defendant's name from the Child Abuse

Registry within ten days of its receipt of this opinion. We do not retain jurisdiction.

Vacated and remanded.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION