# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5310-18T2

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

 Plaintiff-Respondent,

v.

L.M.,

 Defendant-Appellant,

and

R.T., S.J., and M.S.,

 Defendants.

_____

IN THE MATTER OF F.T.,
J.J., C.K.J., and J.S., minors.

_____

Submitted December 1, 2020 – Decided December 21, 2020

Before Judges Haas, Mawla, and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Gloucester County, Docket No. FN-08-0119-16.

Joseph E. Krakora, Public Defender, attorney for appellant (Robyn A. Veasey, Deputy Public Defender, of counsel; Ilea Anne Kozak, Designated Counsel, on the briefs).

Gurbir S. Grewal, Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Amy Melissa Young, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minors (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Melissa R. Vance, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant L.M. ("Laura"[1]) appeals from a May 20, 2016 judgment finding she committed abuse or neglect of her children F.T. ("Fiona"), J.J. ("John"), C.K.J. ("Chloe"), and J.S. ("Julie"). We affirm.

The following facts were adduced at the trial of this matter. Laura is the biological mother of the children. R.T. ("Roger") is the father of Fiona, S.J. ("Sean") is the father of John and Chloe, and M.S. ("Matthew") is Julie's father.

---

[1] We utilize fictitious names to preserve confidentiality. R. 1:38-3(d)(12).

This case began on November 23, 2015, when Laura, who was then residing in Philadelphia, contacted the Division of Child Protection and Permanency (Division) requesting housing assistance and services for the children. At the time, the children were residing with their maternal grandparents, "Jane" and "Bob," in New Jersey for approximately three months. The children's ages were as follows: Fiona, thirteen; John, six; Chloe, four; and Julie, three.

On December 2, 2015, the Division received a referral from the Pennsylvania Department of Human Services (DHS), advising they previously opened a case against Laura for sexual abuse of the children, which had just closed. The reporter advised the children had been residing with Jane and Bob since August 27, 2015 and needed therapy to address the sexual abuse. The reporter further disclosed Sean and Laura had criminal histories; Sean was diagnosed with paranoid schizophrenia but was not receiving treatment; Laura had bi-polar and personality disorder; Sean smoked PCP and marijuana; and both Laura and Sean heavily consumed alcohol.

On December 3, 2015, the Division interviewed the children and the maternal grandparents at their residence. The children reported they liked staying with their grandparents and did not like living with Laura because she

3

would do "bad things." Fiona explained she felt safe at her grandparents' home, was stable there, did not want to leave, and never wanted to return to Laura. John also stated he felt safe with his grandparents and did not feel safe with his mom because Laura and Sean would touch his "pee-pee" and "butt."

The following day, the Division filed an order to show cause to remove the children, and formally placed them with Jane and Bob pending the return hearing on its application. On December 8, 2015, during the hearing on its removal application[2], the Division received a referral alleging Jane was unstable, abused prescription drugs and alcohol while caring for the children, and mistreated other family members.

As a result, a Division caseworker visited Jane and Bob's residence and spoke with Fiona, who was home alone. Fiona reported she was well fed and denied any alcohol abuse by her grandparents. She reported John told her about the sexual abuse committed by Laura and Sean and recounted a time when his parents told him to lick Chloe's private area. Fiona also stated when she asked Chloe if her parents licked her, she "just looks away and down and said yes."

---

[2] The December 8, 2015 order granted the Division custody of the children and granted Laura and Sean supervised visitation by the Division or Division approved supervisors. Visitation with Fiona was at Fiona's discretion.

Fiona also revealed she witnessed many instances of physical violence between Laura and her boyfriends, as well as her siblings' fathers. She described constantly being hit and choked by Laura, especially when she was drunk. She recalled an incident when Laura was drunk and asked her "if she would die for God and [Fiona] said no, so [Laura] threw her bottle of vodka into the fireplace and began to hit [Fiona] and choked her. She also tried to put [Fiona's] head in the fire." Fiona stated she asked Sean for help, but he did nothing.

When Jane and Bob and the younger children returned home, two police officers approached the door and stated Laura came to the police station claiming the children were not being cared for. The Division worker explained the events that occurred earlier in the day and produced documents indicating placement of the children with their grandparents. While the Division worker was talking with the officers, one of them accompanied Fiona to retrieve John at the school bus stop to ensure Laura was not there. When Fiona and John returned, Fiona explained Laura came to the bus stop and she and John hid because they feared she would take them. The worker eventually spoke with John who reported "that his mom and dad had touched him on his pee-pee and butt."

5

Jane produced a prescription for her medication and the Division worker found no other evidence of prescription drug abuse as the caller had claimed. The worker also concluded the residence was suitable for the children, who were well fed and cared for.

On the evening of December 10, 2015, while Jane, Bob, and the children were home, Bob heard a knock on the door. When he opened the door, he saw Laura's cousin, Diana, who wanted to speak with Jane. Bob had not seen Diana in some time, and she did not look well, so he kept her outside of the residence and told Jane that Diana wished to speak to her. Jane told Bob to let Diana in, he exchanged pleasantries with Diana, and returned to a game he was playing with the children.

Shortly after, Bob heard someone banging loudly on the door and saw it was Laura who was pacing back and forth, demanding to see the children, and yelling "get my fucking kids out of the house." This caused the children to flee. Bob opened the door and informed Laura that she was not supposed to be at the residence and that he would call the police if she did not leave. However, she ignored him and repeatedly stated, "get my kids out of this house now." When he turned around to see where Diana was, Laura barged in and began running around the house calling for the children saying she wanted them "out of the

6

house now." Bob and Jane tried to calm Laura down and attempted to restrain her, but she kept yelling "get off me" and "you don't understand." Bob called the police at which point Laura screamed the house was on fire and to get the kids out now. Bob and Jane ran outside and saw smoke coming from the garage, and realized the garage was on fire.

Jane instructed Bob to move their vehicles away from the fire and then ran to the children, who were hiding from Laura in the basement. After Bob moved the vehicles, he returned to the house to search for the children, opened the basement door, and the children ran out of the house toward the street. As the children were running down the street, Jane saw Laura chasing the children and observed Diana put Julie in the backseat of a car. Jane saw Laura run and jump into the car.

Washington Township Police Sergeant Mike Conti responded to the report of a fire at the residence. While in route, he received a call informing him Laura and Diana had left the scene in a vehicle. Conti was one of the officers who responded to the grandparents' residence two days prior and interacted with Laura and Diana at a bus stop. As a result, he recognized Diana as the driver of the vehicle, which he stopped on the way to the scene. As he approached the vehicle, Conti recognized Laura sitting in the passenger seat and saw a child in

the backseat. Diana told him the child belonged to Laura. Conti arrested both women and Laura was charged with kidnapping, aggravated arson, burglary, and criminal attempt.

The Division retained Stephanie V. Lanese, M.D., a forensic pediatrician and child abuse and neglect expert, who evaluated the children regarding the allegations of sexual and physical abuse. Dr. Lanese interviewed Bob and all the children, except for Julie, who had only a physical examination.

John disclosed his parents touched him in the bathroom and asked him to touch them in their private areas. He explained the touching was not merely his parents cleaning him and further stated he witnessed his parents lick his two younger sisters' genitals in their bedroom. He stated his parents told him not to speak about the sexual abuse because "they would get locked up." Dr. Lanese concluded John had been sexually abused by his parents because he described the abuse in a genuine, consistent, and idiosyncratic way.

Chloe revealed her parents touched her private area using "a doll without hair." She described an incident when her parents licked her private part in the kitchen, after pouring a Slurpee on it and stated she had seen naked people on the internet. When Dr. Lanese informed Chloe that she would conduct a physical examination the child became uncooperative, panicked, and covered

her eyes. She refused to answer any other questions, would not make eye contact with the doctor, and refused the physical examination. Dr. Lanese concluded it was "unclear if there were any acute or chronic residua to the genital area[,]" but diagnosed Chloe as being sexually abused by her parents based on Bob's report, John's report, and the child's description, and recommended she receive trauma therapy.

Dr. Lanese's interview and physical examination of Julie did not reveal evidence of sexual abuse. Because Julie was three years old, Dr. Lanese opined she may not have been old enough to understand the context of inappropriate touching and may have been unable to communicate what happened to her. She concluded Julie may have been sexually abused because her brother reported witnessing her being touched inappropriately by her parents.

Fiona denied being sexually abused and declined a physical examination. Dr. Lanese reported Fiona was frustrated and angry throughout the interview. She opined Fiona may have suffered sexual abuse but was not ready to discuss it because she told Bob, "I know things and I've seen things . . . you don't want to hear and you're not ready to hear."

However, Fiona expressed no hesitance in clearly describing physical abuse by her mother. Fiona described that Laura aggressively "grips [her] up

by [her] hair or . . . throws something at [her] like [a] cup or [a] lotion bottle" when she was drunk, and on another occasion hit Fiona with a spatula leaving "big circles on [her] hand[,]" and ripped out Fiona's hair because she was not cleaning and looking hard enough for beer money. She stated Laura "grip[s Fiona] up on [her] arm [in order to make her go to bed] and put[s Fiona] in [her] room and then leave[s]." Fiona recounted the incident where Laura was drunk and threw a bottle of vodka into a fireplace and then pushed Fiona's face "into the fire so that it felt like it was melting." Fiona said there was much yelling and screaming in Laura's household and she was forced to call the police because of the domestic violence between Laura and Sean. Dr. Lanese found Fiona's description of the abuse reliable and genuine and concluded she had been physically abused.

Dr. Lanese concluded Laura's behavior was psychologically detrimental to the children "and ha[d] the potential for long-term negative consequences."

The maternal grandparents corroborated the children's reports of abuse. Jane testified she first became concerned about sexual abuse when Chloe and John were playing. Chloe had a skirt on and John "had his hands up on her private parts." She pulled him aside and asked what he was doing, and he denied any misconduct. She questioned John and asked if anyone had touched "his

private parts in a bad way" and he responded Laura told him to lick Julie's "pee-pee" and he told her no. She asked if anyone else touched him and he responded that Sean, Chloe, and Julie had touched him, but denied touching by Fiona or Matthew. Jane testified she confronted Laura about John's disclosures and Laura said she knew about it because one of her paramours had witnessed the touching, but Laura did not wish to discuss the matter.

Jane asked Chloe if anyone had touched her and she did not respond verbally but stuck out her tongue and made a licking motion. Jane specifically asked if Laura licked Chloe and the child said yes. Chloe then disclosed that Laura, Sean, and a friend of Laura's all licked her genitals with Slurpee's. Jane confronted Laura with these allegations and Laura became upset and argumentative. Once Laura calmed down, Jane had Chloe and John sit down with Laura and asked them whether Laura or Sean ever touched their private parts in a bad way, and both children responded yes. Laura became angry and abruptly left the house. Jane testified she immediately called the Division after hearing the children's disclosures.

Bob testified he witnessed several instances of the children acting out sexually, specifically Chloe grabbing Julie's genitals, as well as Chloe and John grabbing each other's genitals. Bob testified he questioned John about his

disclosure to Jane the day after Jane questioned him and the child stated his parents would touch and grab his "pee-pee." He also reported his parents would pour Slurpee's on Chloe's "pee-pee" and lick it off. He stated Laura and Sean asked him to touch and lick his sisters' "pee-pee," but he refused.

The Division called the supervising family service specialist who described the Division's involvement from the onset of the case as we have recounted. He testified Laura was substantiated for: sexual abuse of John and Chloe; physical abuse of Fiona; placing Julie at risk of harm by kidnapping her; and placing all of the children at substantial risk of harm by starting the fire.

Recounting these facts, the trial judge concluded the Division proved Laura committed acts of abuse or neglect. He found "the incident of [Laura] holding . . . [Fiona] at the fireplace to be a violation of [N.J.S.A. 9:6-8.21(c)(2). And] . . . that under [N.J.S.A. 9:6-8.21(c)(3), the Division proved] sexual abuse by a preponderance of evidence against [Laura] for the sexually inappropriate touching of . . . both [John] and [Chloe]."

Regarding the fire, the judge credited Jane and Bob's testimony that Laura was acting "erratic, . . . highly emotional, and . . . out of character" when she arrived at their residence the day of the incident, and did not inform Jane and Bob there was a fire until Bob stated he was calling the police to remove Laura.

The judge found the "preponderance of the evidence [proved the] fire was generated by, either [Laura's] direct actions or her actions with [Diana] to cause this fire." He concluded the Division proved "that [Laura] put the children in serious danger." The judge also found the Division proved Laura committed "excessive corporal punishment by hitting . . . [Fiona] with a spatula leaving bruises [and] pulling her hair." He concluded these incidents were abuse or neglect pursuant to N.J.S.A. 9:6-8.21(c)(4)(B).

Our review of a family court's abuse or neglect finding is limited. N.J. Div. of Youth & Fam. Servs. v. S.H., 439 N.J. Super. 137, 144 (App. Div. 2015). We must determine whether the decision "is supported by 'substantial and credible evidence.'" N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 448 (2012), (quoting N.J. Div. of Youth & Fam. Servs. v. M.M., 189 N.J. 261, 279 (2007)). We defer to the Family Part's factual findings, because that court has "the superior ability to gauge the credibility of the witnesses . . . and because it possesses special expertise in matters related to the family." Ibid. A family court's decision should not be overturned unless it went "so 'wide of the mark'" that reversal is needed "to correct an injustice." Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)). The court's interpretation of the law or its legal conclusions are reviewed de novo. State ex rel. A.B., 219

13

N.J. 542, 554-55 (2014); <u>Manalapan Realty, L.P. v. Twp. Comm. of Manalapan</u>, 140 N.J. 366, 378 (1995).

"The purpose animating Title Nine 'is to provide for the protection of children . . . who have had serious injury inflicted upon them.'" <u>N.J. Div. of Youth & Fam. Servs. v. P.W.R.</u>, 205 N.J. 17, 31 (2011) (quoting N.J.S.A. 9:6-8.8(a)). Pursuant to N.J.S.A. 9:6-8.21(c), an abused or neglected child is

> a child less than 18 years of age whose parent . . . (2) creates or allows to be created a substantial or ongoing risk of physical injury to such child by other than accidental means which would be likely to cause death or serious or protracted disfigurement, or protracted loss or impairment of the function of any bodily organ; (3) commits or allows to be committed an act of sexual abuse against the child; (4) or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired as the result of the failure of his parent . . . to exercise a minimum degree of care . . . (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment; or by any other acts of a similarly serious nature requiring the aid of the court[.]

The Division "must prove that the child is 'abused or neglected' by a preponderance of the evidence, and only through the admission of 'competent, material and relevant evidence.'" <u>P.W.R.</u>, 205 N.J. at 32 (quoting N.J.S.A. 9:6-8.46(b)). Each case of alleged abuse "requires careful, individual scrutiny" and

14

is "generally fact sensitive." Id. at 33. The proofs must be evaluated based on the totality of the circumstances "because the evidence can be synergistically related." Id. at 39.

On appeal, Laura argues the children's out-of-court statements regarding the sexual abuse were uncorroborated. She argues there was no evidence of age-inappropriate sexual behavior exhibited by the children. She asserts she made no confessions or admissions to support the court's finding of corroboration. Laura also argues there was no objective evidence to corroborate Fiona's out-of-court statements to prove the alleged excessive corporal punishment or injury to the child. Laura argues the Division did not prove she set the fire at her parents' residence by a preponderance of the evidence.

We reject Laura's arguments that the Division failed to prove she sexually abused and permitted sexual abuse of John and Chloe. In an abuse or neglect proceeding, children's out-of-court statements "relating to any allegations of abuse or neglect shall be admissible in evidence; provided, however, that no such statement, if uncorroborated, shall be sufficient to make a fact[-]finding of abuse or neglect." N.J.S.A. 9:6-8.46(a)(4). Corroboration requires "direct or circumstantial evidence beyond the child's statement itself." N.J. Div. of Child Prot. & Permanency v. A.D., 455 N.J. Super. 144, 157 (App. Div. 2018) (citing

15

N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 522 (App. Div. 2017)). When reviewing a child's hearsay statement under N.J.R.E. 803(c)(27), the court may consider the child's repetition and consistency of statements, but "consistency alone does not constitute corroboration." N.B., 452 N.J. Super. at 523. We review the trial court's determination of corroboration de novo. A.D., 455 N.J. Super. at 156.

Within the context of child sexual abuse, we have stated:

> The child victim is often the only eyewitness to the crime, and physical corroboration is rare because the sex offenses committed against children tend to be nonviolent offenses such as petting, exhibitionism, fondling and oral copulation. Physical corroboration may also be unavailable because most children do not resist, either out of ignorance or out of respect for authority. Consequently, in order to give any real effect to the child victim hearsay statute, the corroboration requirement must reasonably be held to include indirect evidence of abuse. Such evidence has included a child victim's precocious knowledge of sexual activity, . . . and psychological evidence.
>
> [N.J. Div. of Youth & Fam. Servs. v. Z.P.R., 351 N.J. Super. 427, 436 (App. Div. 2002).]

The record demonstrates the Division proved the sexual abuse allegations by a preponderance of the evidence. John and Chloe were consistent with their detailed description of events, which they recounted at different times to different adults, namely, the Division worker, Dr. Lanese, and the maternal

grandparents. Both children were clear regarding who perpetrated the abuse and readily differentiated the sexual abuse from touching which may have occurred during a bath or toileting. They also confided in Fiona regarding the abuse. The children even identified Laura as their abuser in her presence and Laura's response was to leave Jane's residence. Our review of the record convinces us the children's statements regarding the sexual abuse allegations were genuine and there was no evidence to rebut the Division's proofs.

There was also evidence of age inappropriate behavior, which corroborated the claims of sexual abuse, namely, John and Chloe touching each other's genitals and Chloe similarly touching Julie, which the maternal grandparents observed. Contrary to Laura's argument, her lack of a confession or admission to the abuse was not fatal to the issue of corroboration, considering the evidence of abuse adduced by the Division.

We also reject Laura's argument the Division did not prove Fiona was subjected to excessive corporal punishment. While "[t]he law does not prohibit the use of corporal punishment," and "a parent may inflict moderate correction such as is reasonable under the circumstances of a case," excessive corporal punishment is expressly prohibited. Dep't of Child. & Fams., Div. of Youth & Fam. Servs. v. K.A., 413 N.J. Super. 504, 510 (App. Div. 2010). Although Title

Nine does not define excessive corporal punishment, we have held "'excessive' means going beyond what is proper or reasonable." Id. at 511. "[A] single incident of violence against a child may be sufficient to constitute excessive corporal punishment." Ibid. We have held "the use of an instrument to hit the child with such force that visible marks were left, the unreasonable and disproportionate parental response, and the fact that the incidents were not isolated but part of a pattern of physical punishment" are factors the court may consider when determining whether a child suffered excessive corporal punishment. S.H., 439 N.J. Super. at 146-47.

Fiona's vivid descriptions of the litany of physical abuse perpetrated by her mother to the Division worker and separately to Dr. Lanese amply supports the trial judge's findings of excessive corporal punishment. When considered in the totality of the circumstances, namely, Laura's inebriation, the incidents of hair pulling, placing the child's face into a fire, throwing objects at the child, and hitting the child with a kitchen implement, singularly and collectively meet the definition of excessive corporal punishment.

Contrary to Laura's assertions, the Division was not required to adduce evidence of Fiona's injuries to meet its burden of proof. IMO Guardianship of DMH, 161 N.J. 365, 383 (1999). As Dr. Lanese stated: "The most significant

18

impact for the child is psychological and has the potential for long-term negative consequences. It is important that she be referred to a clinical mental health provider for trauma-focused cognitive behavioral therapy for physical abuse."

Finally, we reject Laura's argument the Division failed to prove she started the fire. There was no evidence presented to rebut Jane and Bob's credible testimony that Laura's behavior on the day of the incident was erratic and was immediately followed by the fire. The substantial credible evidence in the record readily demonstrates the fire was a poorly conceived ruse to remove the children from their grandparents, which placed the children at substantial risk of harm pursuant to N.J.S.A. 9:6-8.21(c)(4)(B).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION