# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3821-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

     Plaintiff-Respondent,

v.

N.S.,[1]

     Defendant-Appellant,

and

R.D., P.B., M.B., B.B., P.G.,
and O.S.,

     Defendants.

_____

IN THE MATTER OF Z.D.
and Z.D., minors.

_____

Submitted September 20, 2021 – Decided October 5, 2021

---

[1]  We use initials and pseudonyms to protect the identities of the children and parties and to preserve the confidentiality of these proceedings.  R. 1:38-3(d)(11).

Before Judges Vernoia and Firko.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket No. FN-07-0185-19.

Joseph E. Krakora, Public Defender, attorney for appellant (John A. Albright, Designated Counsel, on the briefs).

Andrew J. Bruck, Acting Attorney General, attorney for respondent (Melissa H. Raksa, Assistant Attorney General, of counsel; Lisa Cerasia, Deputy Attorney General, on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor Z.D. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel C. Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

Joseph E. Krakora, Public Defender, Law Guardian, attorney for minor Z.D. (Zi.D.) (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Cory H. Cassar, Designated Counsel, on the brief).

PER CURIAM

Defendant N.S.,[2] the biological mother of Z.D. (Zeke), born in 2014, and Z.D. (Zara), born in 2013, appeals from a June 27, 2019 Family Part order finding she physically abused or neglected these two children and emotionally

---

[2] Defendant R.D., the biological father of Zeke and Zara, and co-defendants P.R., M.B., B.B., P.G., and O.S., have not filed an appeal.

2                                                                    A-3821-19

abused all of the children living in her home by allowing violence to continue in their presence within the meaning of N.J.S.A. 9:6-8.21(c)(1), (2) and (4)(b). N.S. also appeals the May 5, 2020 order terminating the litigation. The Law Guardians seek affirmance. Having reviewed the record, we conclude the judge's twenty-three-page fact-finding decision was supported by sufficient credible evidence and is consistent with the applicable law. Therefore, we affirm both orders.

I.

We discern the following facts from evidence adduced at the fact-finding hearing. In August 2018, O.S., who is N.S.'s boyfriend, moved into a four-bedroom apartment with Zeke and Zara, along with the following other adults and children: P.B., who is the mother of J.B., A.J., T.B., and A.B.; M.B., P.B.'s mother; B.B., P.B.'s sister; and P.G., M.B.'s sister. In total, six adults were living in the subject household. On December 5, 2018, the Division of Child Protection and Permanency (Division) received a referral from University Hospital regarding allegations that then three-year-old Zeke was injured at home. Earlier that day, a teacher's aide, A.P., observed Zeke crying and noticed a bruise on his cheek. A.P. escorted Zeke to the school nurse, A.A., and noticed

when he went to wash his hands, he was "shaking" and "walking extremely slow . . . like an elderly . . . person."

A.A. examined Zeke, and following a full body scan, noted his back was bruised and scarred, his feet and ankles were blistered, his legs were inflamed, and he had circular marks resembling cigarette burns on his left leg above the knee. During the ambulance ride en route to University Hospital, Zeke told N.S. that P.B. dunked him in hot water. Zeke also told A.P. that his "mommy" burned him with a cigarette. The hospital records indicated that Zeke presented with "new and old injuries consistent with child abuse." In addition, the hospital records noted Zeke had "round healed circles to right arm. Wounds consistent with cigarette burns."

Division investigator Klidy Valderrama interviewed A.P. and A.A. at Zeke's school. Because Zeke was fatigued and uncommunicative, Valderrama was unable to interview him at the hospital, but she testified about eighteen photographs she took of his injuries, including multiple bruises on his body; a strap-shaped bruise on his back; and second-degree burns above his ankles. The investigator also interviewed N.S., M.B., O.S., Zeke, Zara, and O.J. According to N.S., she did not notice any injuries on Zeke's face but suspected P.B. bruised Zeke's cheek due to ongoing physical altercations between P.B. and B.B.

During M.B.'s interview at the Essex County Correctional Facility (ECCF), she told the investigator she was not residing at the home on December 5, 2018 because M.B. was hospitalized after P.B. attacked her. M.B. recalled seeing N.S. and O.S. hit Zeke and Zara, and O.S. using a belt on numerous occasions. N.S. was present during some of the whippings but did not intervene. M.B. stated that on one occasion, O.S. struck Zeke with a belt and drew blood.

Valderrama interviewed then four-year-old A.J. at the hospital. A.J. stated Zeke was hospitalized because N.S. and O.S. make Zeke "bleed until they die," and added N.S. and O.S. hit Zeke and Zara. During his December 5, 2018 interview, A.J. also told Valderrama that P.B. poured a pot of hot water on Zeke in the bathtub, and P.B. hit Zeke and Zara with a belt.

O.S. was interviewed by Valderrama at the ECCF. He claimed he had been incarcerated since November 30, 2018. O.S. noticed a bruise on Zeke's cheek prior to his incarceration and mentioned it to N.S. O.S. also stated that P.B. hung M.B. out of a window and physically attacked M.B. and B.B. According to O.S., he never physically abused Zeke or Zara.

Three-year-old T.B. was interviewed at the hospital by Valderrama on December 5, 2018, and claimed she saw P.B. and M.B. put Zeke in hot water

5

because he misbehaved; saw P.B. punch and kick Zeke and Zara; and P.B. and B.B. "whooping" them. T.B. also said P.G. hits Zeke and Zara with a brush.

Seven-year-old J.B. was interviewed at the hospital by Valderrama. He noticed Zeke's burns in the morning the day prior. The next day, December 6, 2018, Valderrama interviewed J.B. again who claimed Zeke's burns were caused by J.B. accidently pushing him onto the radiator and his siblings were lying about the pot of water being poured on Zeke. However, J.B. stated N.S. and O.S. slap Zeke and Zara, whoop them with a belt, and confirmed O.S. drew blood when he whooped Zeke and T.B. exited the room with blood on her face that was not hers.

Forensic Interview Specialist Karen Zambrano Casey conducted forensic video interviews (FVI) of Zeke, Zara, and A.J. A.J. reiterated his story that the previous night P.B. and M.B. poured hot water from a pot on Zeke while he was in the bathtub because sometimes he's bad and "pees" on himself. Zeke tried to get out of the bathtub, but P.B. and M.B. pushed him back down and instructed A.J. to get a belt and used it to "whoop[]" Zeke. N.S. was asleep in another room when this occurred. On another occasion, P.B. gave A.J. "a chance to hit" Zeke, and P.B. helped T.B. whoop Zeke because she doesn't hit very hard. O.S. and M.B. also whooped Zeke with a belt according to A.J.

A-3821-19

On December 5, 2018, Zara told Zambrano Casey that Zeke gets in trouble when he urinates on himself, and she has to give him a butt-whooping, which P.B. taught her how to do. Zara claimed one time P.B. whooped Zeke with a belt, as did Zara. On another occasion, Zara explained that T.B. and everybody pushed Zeke and whooped him with their hands because "he peed on himself."

Zeke told Zambrano Casey that O.S. whoops him with a belt on his back, fingers, and "tun tun," and added "everybody" whoops him, including N.S., M.B., and P.B. During the interview, Zeke showed Zambrano Casey the "boo-boos" on his ankles and feet, which he described felt "bad" after P.B. put hot water on him in the bathtub. At the conclusion of the interview, Zeke spat on Zambrano Casey, swung his arms and hit her, saying he was "mad."

On December 6, 2018, Detective Casey McCabe of the Essex County Prosecutor's Office conducted an FVI of J.B. He confirmed seeing blood on the belt O.S. used to whoop Zeke and Zara and O.S. threatening Zeke and Zara with "body shots," although J.B. did not describe what that term meant. J.B. also stated that N.S. and O.S. "take it to the next level," "[t]hey don't even talk to their kids before they whoop them . . . or give them a second chance."

On December 7, 2018, Zeke underwent a medical evaluation by Dr. Monica Weiner, the Medical Director of Metro Regional Diagnostic and

Treatment Center. In addition to her examination, Dr. Weiner observed Zeke's FVI, reviewed his records from University Hospital, and the photographs of his injuries. Zeke told Dr. Weiner "[d]addy" had burned him with a cigarette, and that hot water burned his feet. Dr. Weiner concluded "[t]his burn pattern is consistent with [the children's] statements that hot water was poured on [Zeke]."

In addition, Dr. Weiner identified "several round hyper[-]pigmented lesions approximately 7-8 mm in diameter on [Zeke's] right lower arm and his left lower leg." She opined that these marks were consistent with past cigarette burns and noted:

> multiple bruises and patterned marks on his torso, including his suprapubic area and penis, and his sides. There were several looping or curved marks, indicating impact with a looped or curved object. . . . There were patterned marks on his suprapubic area and his left lower abdomen. There was extensive bruising on his right lower abdomen and on [December 5, 2018], the glans of his penis was red and swollen. These lesions are consistent with the reports that [Zeke] was hit with a belt and also punched and kicked. There were also extensive bruises on his back, which could be consistent either with impact from a belt or . . . punching or kicking.
>
> There were also several bruises on his face, including one under his right eye which appeared to have a pattern of a circular shape crossed by a line. . . . There was also a small contusion on his inner right upper lip. All of these could be consistent with impact with a belt or hand or foot.

A-3821-19

Dr. Weiner commented Zeke's injuries were "too numerous to count" and that he endured "ongoing physical abuse."  She added that making Zeke "the target of most of the physical abuse is also emotional abuse" and "[e]xposing the other children in the home to [Zeke's] physical abuse . . . and encouraging them to abuse [Zeke] themselves is emotional abuse of the other children." Finally, Dr. Weiner noted that during her examination, Zeke displayed severe mood swings and transitioned frequently from being cooperative and playful to becoming combative.  His behavior included swearing, spitting, and trying to bite the adults in the room, which Dr. Weiner opined could be attributable to emotional abuse.

As a result of this investigation, on December 7, 2018, the Division filed a complaint under N.J.S.A. 9:6-8.21 and N.J.S.A. 30:4C-12 against N.S. and R.D. for custody of Zeke and Zara.  N.S. was present at the hearing and represented by counsel.  The judge determined that an emergency Dodd[3] removal of all of the children from the home was appropriate.  At the

---

[3] A "Dodd removal" refers to the emergency removal of a child from the home without a court order as authorized by N.J.S.A. 9:6-8.29 of the Dodd Act, N.J.S.A. 9:6-8.21 to -8.82.

prosecutor's request, N.S.'s visitation with Zeke and Zara was suspended pending completion of the criminal investigation into the matter.[4]

On December 13, 2018, Dr. Shaina Groisberg, a pediatrician specializing in child abuse, evaluated Zara, who reported P.B. "put hot water on my baby brother." Zara also mentioned that O.S. and P.B. gave her butt-whoopings. She stated, "I'm not going to that house no more. Because I don't want to, I don't like it." Dr. Groisberg observed a 7 mm circular hyper-pigmented mark on the back of Zara's right shoulder consistent with a past cigarette burn. The expert concluded Zara had been the subject of emotional abuse due to her persistent exposure to violence in the home.

On January 19, 2019, Dr. Groisberg evaluated A.J. He admitted that P.B., his mother, poured hot water on Zeke because he urinated in the bathtub. Dr. Groisberg concluded A.J. was coached by his mother and feared her. As with Zara, Dr. Groisberg concluded A.J. was also the subject of emotional abuse in light of his exposure to violence in the home and the encouragement he received to inflict pain on the other children residing there. Dr. Groisberg added that being encouraged to participate in the infliction of harm could lead to a lasting

---

[4] The record does not mention the outcome of the criminal investigation.

A-3821-19

impact on the children's "interpersonal relationships, behavior problem[s,] and aggression[,] . . . depression, anxiety[,] and post-traumatic stress disorder."

On May 7, 2019, the Division concluded its investigation and found the allegations of abuse and neglect were substantiated for all of the adults living in the home. The Family Part conducted a fact-finding hearing over a period of six nonsequential days. The judge heard fact testimony from Valderrama and A.P. Dr. Weiner and Dr. Groisberg were called as expert witnesses in the field of pediatrics with a sub-specialty in pediatric child abuse. N.S. was incarcerated at the time of the hearings, but attended on May 22 and 23, and waived her appearance on May 28. She did not testify and neither did R.D. The Law Guardian did not call any witnesses.

At the conclusion of the hearing, the judge found, by a preponderance of the credible evidence, that N.S. abused and neglected Zeke and Zara in violation of N.J.S.A. 9:6-8.21(c)(1), (2), and (4)(b). The judge found N.S. physically abused Zeke and Zara, and emotionally abused all of the children in the home by allowing the violence to continue in their presence. In reaching her decision, the judge emphasized "[i]t is inconceivable that the adults living in the home were unaware of the abuse." The judge found "that the children's out[-]of [-]court statements were corroborated by physical and testimonial evidence."

11

She highlighted the fact that "all of the verbal children indicated that there was ongoing violence in the home," and Zeke "suffered emotional abuse as the 'target child.'" In conclusion, the judge found "[a]ll the adults in the home failed to protect the children." This appeal ensued.

On appeal, N.S. challenges the sufficiency of the evidence supporting the judge's findings and argues: (1) the judge's conclusion the children were emotionally abused is grounded on expert testimony that is untethered to any accepted or reliable foundation; (2) the judge deprived N.S. of due process by sua sponte shifting the burden of proof to her to demonstrate her lack of involvement in the alleged negligent and abusive conduct; and (3) the judge erred by admitting recordings of the children's FVI's because the recordings were not properly authenticated. For the reasons that follow, we disagree and affirm.

## II.

Our review of a trial court's finding of abuse or neglect is guided by well-established principles. "[W]e accord substantial deference and defer to the factual findings of the Family Part if they are sustained by 'adequate, substantial, and credible evidence' in the record." N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 521 (App. Div. 2017) (quoting N.J. Div. of Youth &

A-3821-19

Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014)). "Indeed, we recognize that '[b]ecause of the family courts' special jurisdiction and expertise in family matters, [we] should accord deference to family court factfinding.'" N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (first alteration in original) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)).

However, "if the trial court's conclusions are 'clearly mistaken or wide of the mark[,]' an appellate court must intervene to ensure the fairness of the proceeding." N.J. Div. of Youth & Fam. Servs. v. L.L., 201 N.J. 210, 227-228 (2010) (alteration in original) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)). We owe no deference to the trial court's legal conclusions, which we review de novo. N.J. Div. of Youth & Fam. Servs. v. A.B., 231 N.J. 354, 369 (2017).

"The Division bears the burden of proof at a fact-finding hearing and must prove . . . harm . . . by a preponderance of the evidence." N.J. Dep't. of Child. & Fams., Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 22 (2013) (citing N.J.S.A. 9:6-8.46(b)). The Division must sustain that burden "through the admission of 'competent, material and relevant evidence.'" N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 32 (2011) (quoting N.J.S.A. 9:6-8.46(b)). In making a determination of abuse and neglect, the trial court should base its

13

decision on the totality of the circumstances. N.J. Div. of Youth & Fam. Servs. v. V.T., 423 N.J. Super. 320, 329 (App. Div. 2011). In light of the standards, we find no basis to disturb the judge's findings of fact, and those findings support her legal conclusion.

As defined in Title 9, "abuse or neglect" may occur when a child's "physical, mental, or emotional condition has been impaired . . . as a result of" a parent who fails to "exercise a minimum degree of care . . . in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment." N.J.S.A. 9:6-8.21(c)(4)(b). A parent or guardian may fail to exercise the minimum degree of care if "he or she is aware of the dangers inherent in a situation and fails adequately to supervise the child or recklessly creates a risk of serious injury to that child." G.S. v. Dep't of Hum. Servs., 157 N.J. 161, 181 (1999) (citation omitted). The Division must prove its allegations by a preponderance of the evidence at a fact-finding hearing. N.J.S.A. 9:6-8.46(b)(1).

Parental rights include the right to take reasonable measures in disciplining a child, including corporal punishment. N.J. Dep't of Child & Fams., Div. of Youth & Fam. Servs. v. K.A., 413 N.J. Super. 504, 510 (App.

Div. 2010) (citing State v. T.C., 347 N.J. Super. 219, 239-40 (App. Div. 2002)). "A determination of abuse must be shown by a preponderance of the evidence during a fact-finding hearing." Ibid.

"[P]revious statements made by the child relating to any allegations of abuse or neglect" are admissible, and not considered hearsay, as long as they are not the sole basis for the court's finding of abuse or neglect. N.J.S.A. 9:6-8.46(a)(4). Proof of any injuries sustained by the child that are "of such a nature as would ordinarily not . . . exist except by reason of the acts or omissions of the parent or guardian" is prima facie evidence of abuse or neglect. N.J.S.A. 9:6-8.46(a)(2).

"Excessive corporal punishment" is not defined by statute but is determined on a case-by-case basis. K.A., 413 N.J. Super. at 510. In K.A., we noted "excessive corporal punishment" should be read in light of the term's common usage and understood meaning. Id. at 511. While the boundaries of what constitutes "excessive corporal punishment" are undefined in the statute, we have placed particular weight on the statute's inclusion of the word "excessive" and have stated that "[t]he term 'excessive' means going beyond what is proper or reasonable." Ibid. Thus, while "moderate correction" may be

reasonable, "a single incident of violence against a child may be sufficient to constitute excessive corporal punishment." Id. at 510, 511.

Excessive corporal punishment may occur when "the child suffers a fracture of a limb, or a serious laceration, or any other event where medical intervention proves to be necessary . . . provided that the parent or caregiver could have foreseen, under all of the attendant circumstances, that such harm could result from the punishment inflicted." Id. at 511 (citation omitted). The administrative code provides further guidance, listing injuries that may constitute abuse or neglect, including "[c]uts, bruises, abrasions, welts or oral injuries." N.J.A.C. 10:129-2.2(a)(9).

We noted that certain types of injuries inflicted by a parent or guardian may be considered per se excessive corporal punishment:

> A situation where the child suffers a fracture of a limb, or a serious laceration, or any other event where medical intervention proves to be necessary, may be sufficient to sustain a finding of excessive corporal punishment, provided that the parent or caregiver could have foreseen, under all of the attendant circumstances, that such harm could result from the punishment inflicted.
>
> [K.A., 413 N.J. Super. at 511.]

In K.A., we concluded that the defendant mother, who punched her eight-year-old autistic child approximately four to five times in the shoulder after the

16

child failed to follow directions, had not inflicted excessive corporal punishment. Id. at 506, 512. We particularly noted that the defendant's actions were isolated and occurred during "the trying circumstances which [the defendant] was undergoing due to [the child's] psychological disorder." Ibid. Finally, the defendant showed remorse and took responsibility for her actions. Ibid. We also emphasized that

> [the defendant] was alone, without support from either her spouse/co-parent or from other members of her extended family, such as an experienced mother or aunt. Out of sheer frustration, or through an ill-advised impulse, she struck her child five times. These blows, though undoubtedly painful, did not cause the child any permanent harm, did not require medical intervention of any kind, and were not part of a pattern of abuse.
>
> [Ibid.]

In this matter, the record convincingly established by a preponderance of the evidence that N.S. abused and neglected Zeke and Zara. We note N.S. did not object to the experts' testimony that exposure to violence and abuse causes emotional and psychological harm. For example, Dr. Groisberg testified, without challenge, "it's well-established in the medical and psychiatric communities" that exposure to violence causes psychological harm to a child. Moreover, Dr. Weiner opined that the behavior exhibited by Zeke demonstrated

17

emotional and psychological harm attributable to the physical abuse and exposure to violence he endured.

These expert opinions did not constitute "inadmissible ultimate-issue pronouncements," and we reject N.S.'s argument on this point. And, the record contains ample evidence Zeke and Zara were physically abused by N.S. and that she encouraged other adults in the household to physically abuse the children. The expert testimony, in addition to the testimony of Valderrama and A.P., established a pattern of corporal punishment and exposure to violence in N.S.'s household. We are unpersuaded by N.S.'s argument, and we will not interfere with the judge's finding of abuse and neglect. See N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 442-43 (App. Div. 2001).

III.

We also reject N.S.'s contention that the judge improvidently shifted the burden of proof to her in violation of her constitutional due process rights. The judge expressly found the Division sustained its burden of proof. In summarizing the evidence in the record, the judge emphasized "the defendants presented no expert testimony to dispute the findings of the doctors that examined [Zeke] and determined that his injuries were consistent with child abuse." Moreover, the judge found the photographs taken by the Division and

18

Dr. Weiner "depict the extent and gruesome nature of the injuries sustained by [Zeke] at the hands of the people who cared for him."

The judge's reference to the lack of evidence presented by N.S. and the other defendants constitutes nothing more than a recognition that the Division's evidence, which the judge found established N.S. abused and neglected the children, was not refuted. Further, the judge placed significant weight on Dr. Weiner's and Dr. Groisberg's expert testimony. Accordingly, the judge did not shift the burden of proof to N.S., but rather appropriately found the Division satisfied its burden by a preponderance of the evidence.

IV.

Finally, for the first time on appeal, N.S. argues that the FVIs were not properly authenticated at the hearing. Where a defendant raises an argument on appeal that was not previously raised below, we review the argument under the plain error standard. State v. Robinson, 200 N.J. 1, 20 (2009) (discussing application of Rule 2:10-2). Under the plain error standard, any errors or omissions should be disregarded "unless it is of such a nature as to have been clearly capable of producing an unjust result." R. 2:10-2. "Plain error is a high bar . . . ." State v. Santamaria, 236 N.J. 390, 404 (2019).

"The 'high standard' used in plain error analysis 'provides a strong incentive for counsel to interpose a timely objection, enabling the trial court to forestall or correct a potential error.'" Ibid. (quoting State v. Bueso, 225 N.J. 193, 203 (2016)). Where a defendant raises a new issue on appeal, he or she "bears the burden of establishing that the trial court's actions constituted plain error." Id. at 404-05 (quoting State v. Ross, 229 N.J. 389, 407 (2017)). Under the plain error standard, "[t]he mere possibility of error is insufficient for reversal." N.J. Div. of Youth & Fam. Servs. v. N.S., 412 N.J. Super. 593, 622 (App. Div. 2010). In this light, N.S.'s argument lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

We note that N.S. did not object to the admission of the FVI recordings at the hearing on the basis of lack of authentication. To the contrary, the record reflects that N.S.'s counsel asked questions related to the authentication of the recordings but then acquiesced to their admission into evidence. Therefore, we discern no error, let alone plain error, warranting reversal on the authentication issue.

Here, the record contains sufficient evidence for the judge to find N.S. abused and neglected Zeke and Zara, and that they suffered emotional harm by directly witnessing physical and psychological abuse as defined by Title 9.

20

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-3821-19