# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0927-22

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

R.S.,

      Defendant,

and

F.A.,

      Defendant-Appellant.

_____

IN THE MATTER OF A.A.,
C.A., and B.A., minors.

_____

Submitted April 10, 2024 – Decided April 22, 2024

Before Judges Firko and Vanek.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Camden County, Docket No. FN-04-0320-21.

Jennifer Nicole Sellitti, Public Defender, attorney for appellant (Phuong Vinh Dao, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Mary L. Harpster, Deputy Attorney General, on the brief).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minor A.A. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel Christian Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

Jennifer Nicole Sellitti, Public Defender, Law Guardian, attorney for minors C.A. and B.A. (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Todd S. Wilson, Designated Counsel, on the brief).

PER CURIAM

Defendant F.A.[1] appeals from the February 22, 2022 Family Part order finding he abused or neglected his three minor daughters, A.A., C.A., and B.A., under Title 9, N.J.S.A. 9:6-8.21(c)(4)(b), through the "infliction of excessive corporal punishment." The New Jersey Division of Child Protection and

---

[1] We use initials and fictitious names to protect the parties' privacy. R. 1:38-3(d)(12).

Permanency (DCPP) and the Law Guardians representing A.A., C.A., and B.A. seek affirmance. Having carefully reviewed the record, we conclude the judge's fact-finding decision was supported by sufficient credible evidence and is consistent with the applicable well-settled law. We affirm.

I.

We discern the following facts from the evidence adduced at the February 22, 2022 fact-finding hearing. A.A., C.A., and B.A. are the biological children of F.A., born to his marriage with R.S.[2] in 2004, 2005, and 2009, respectively. F.A. and R.S. divorced in 2011. Around 2015, F.A. obtained full custody of his three daughters and moved with them from North Carolina to New Jersey. Further details of that custody determination are not in the record before us.

In the early-morning hours of February 7, 2021, the Gloucester Township Police Department responded to a call seeking help for A.A. and C.A. at the home they shared with their father. In the hours preceding the call, F.A. arrived home from the gym and discovered C.A. using her cellphone to communicate with friends. This upset F.A., as he felt his house rules regarding the use of electronic devices had been violated.

---

[2] The judge made no findings as to R.S., and she is not a party to this appeal.

F.A. began yelling at C.A. at such a volume that he could be heard by A.A. in a separate room. F.A. then slapped C.A. hard enough that she "saw stars." A.A. heard F.A. leave C.A.'s room and obtain a belt from his own room. She knew it was a belt because of the "clanking sound" it made and because F.A. had "hit [his daughters] previously . . . with the belt."

C.A. went downstairs at F.A.'s request. He instructed her to bend and place her hands on a dog kennel with her back facing him, which she refused to do out of fear when she saw the belt in her father's hand. C.A. fell to the floor. She testified she was not sure how she got on the floor but she did not believe her father had pushed her.

F.A. repeatedly swung the belt at C.A. while she was on the floor, so she began "crawling back with [her] hands . . . behind [her], like crawling on the floor kind of like the crab walk," as she was "trying not to get hit by the belt." From upstairs, A.A. could hear "the sounds of him hitting [C.A.]" and her sister screaming for help, but A.A. was conflicted as to whether she should help her sister out of fear her father's punishment "would turn to [her]."

Next, F.A. began trying to pull C.A. down the stairs to the basement. C.A. was "hanging on to whatever [she] could to not go down to the basement." She "knew from [a] previous . . . incident" that when F.A. took one of the girls "down

A-0927-22

to the basement[, he] was going to hurt [them] more, because he didn't want . . . people to hear [their] screams." When C.A. continued resisting, F.A. "grabbed [her] by [her] hair [as] he was . . . pulling [her] downstairs, and then [she] tumbled down."

Once in the basement, F.A. again hit C.A. with the belt and then "choked [her] with two hands on top of [her]." C.A. testified: "At that point . . . I couldn't breath[e] . . . and he was telling me he was going to kill me. But[] then once he saw that I like really could not breath[e] . . . that's when he lifted his hands and I could finally breath[e]."

C.A. tried to back away from her father, but "he just kept beating [her] with the belt everywhere." F.A. "hit [C.A.] on [her] face . . . in [her] left eye." She testified: "That's when I finally tried to get up, because that's when I felt my face—I felt my left eye and I felt there was something there. And, I [realized] this is serious, so I got up and I sat on the couch."

In an attempt to distract her father from continuing the beating, C.A. told her father that A.A. had also been accessing electronic devices in a manner she thought would upset F.A. F.A. called A.A. to the basement. When she arrived, A.A. "could tell that [C.A.'s] face was bruised at least, like she had gotten injured in the face." A.A. testified:

I sat . . . away from [C.A.] on the opposite end of the couch and he began to yell at me. . . . So, [C.A.] had told him that I had a second phone the year prior. So, he was yelling at me because of that. And, he was asking about [a]n Instagram account, because I was not allowed to have one. So, he was asking, yelling, and I just . . . said I had one just to make him less angry. And, so he—he still had the belt with him. So, he made [me] like kind of brace myself against the couch and then he began to hit me with the belt. And then like every so often he would stop and take a break. And he . . . would yell and me scream that, and then he would just continue to do it. . . . [H]e was hitting me . . . on my lower back to my butt.

Eventually, F.A., A.A., and C.A. went back upstairs. F.A. instructed C.A. to clean up the areas of the living room that were disturbed during their struggle and he gave her ice for her injured eye. A.A. testified C.A. seemed "light-headed or almost passed out," so F.A. "made her get . . water or . . . a cup of ice." A.A. testified F.A. began trying to bypass the lock on her phone to access its content but was unable to. As punishment for not unlocking her phone at his request, F.A. began making A.A. do "pushups and planks" and hit her when she was unable to perform as he wanted.

F.A. then told A.A. and C.A. that he "had all night" to continue with their respective punishments and instructed them to accompany him to his bedroom. A.A. testified:

A-0927-22

> [H]e . . . made me do . . . pushup[s] and wall sits. And then he would hit me . . . . And he kept like asking for the passwords . . . .
>
> During this time he was sending [C.A.] in and out of the room. He would tell her to leave, and he would tell her to come back. I'm not quite sure why. But, she was just leaving in and out.

While F.A. was hitting A.A., C.A. snuck into B.A.'s room and took her electronic tablet. In between being called to and sent away from F.A.'s room, C.A. used the tablet to contact one of her friends via Google Meet and told them to "call the police because [her] dad was hurting [her] and [A.A.]." C.A. testified:

> The police came . . . my dad heard a knock on the door and he . . . got up and he crept into the hallway where the staircase is, and he looked outside. . . . And, he saw there was an officer. And he said, who called the police? And [A.A.] said it was me. And . . . that's when he went . . . downstairs. And he told [A.A.] to go into her room and he told me to hide in . . . his closet.

While sitting in the closet, C.A. considered whether she should disobey her father's instructions and leave the closet to speak with the police stating:

> I was just scared for my sisters. [M]y dad wasn't going to stop any time soon . . . . I was scared he would hurt [A.A.]. I knew he wouldn't hurt her that bad, but I still didn't want her to . . . hurt anymore. So, that's why I decided to [talk to the] police.
>
> . . . .

7

[S]o when I came out into his room, I went to my sister. And my sister was telling me, please don't. You know we don't have nowhere to go. We're never going to find somewhere . . . for us to go. And I went downstairs and I opened up the door. . . . [T]he door slammed when I closed it. And then . . . the officer was like is that [C.A.]? And, then [F.A.] was like, yes.

F.A. was arrested.[3] The three girls temporarily went to stay at the home of F.A.'s girlfriend. On February 9, 2021, DCPP filed a complaint and order to show cause (OTSC) seeking custody of the girls, permission to provide them with medical treatment, and an order preventing F.A. from contacting his daughters. The same day, the judge held a hearing and determined that the girls' removal from their home was "necessary to avoid ongoing risk to life, safety, health of those children." The judge granted DCPP custody of the girls. DCPP arranged for the girls to have medical evaluations with Dr. Stephanie Lanese.

On March 1, 2021, the judge held a hearing on the return date of the OTSC and ordered DCPP to have continued custody of the girls. On April 8, 2021, the three girls relocated to North Carolina to live with R.S. The judge held case management conferences on April 30, May 25, July 23, October 25, and November 16, 2021.

---

[3] The outcome of F.A.'s criminal proceedings is not in the record before us.

A-0927-22

DCPP called Dr. Lanese, A.A., C.A., and DCPP investigator Noah Smith to testify. The defense called no additional witnesses. Dr. Lanese was qualified as an expert at trial with no objection. She testified that at the time of the exam, which was three days after the incident, C.A. "still had injuries which were consistent with the history she provided."

> On [C.A.'s] physical exam, starting from her face, she had a very large area of bruising over the left eye. It was about six centimeters by four centimeters. The bruising was yellow. Within that bruise, around the eye, on top of the upper eyelid there was a smaller area of a purply-red bruise. So, just on the eyelid, like above the . . . eyelashes. And then below the eyelid, on the lower eyelid there was also this darker bruising. And that could be due to gravity. Sometimes bruising, the blood goes down to the loosest part of the tissue on your face, which is actually your lower eyelids.
>
> Then right next to it, along her temple there was a very large curvilinear mark that went up from check up to the temple, and then back down. That mark was abraded and had scabbing on it by the time I saw her.
>
> She also had a f[a]int linear mark on the left cheek. On her right upper arm there was a very large nine centimeter by three centimeter curvilinear mark that went from the posterior aspect or the back of the arm, and down towards the elbow, towards the lateral side.

Dr. Lanese further testified about numerous other bruises and scabs on C.A.'s body from the February 7, 2021 incident in various stages of healing. DCPP introduced photographs taken from the night of the incident, which Dr.

9

Lanese testified accurately depicted the injuries she observed during her examinations.

As to A.A., Dr. Lanese testified: "[A.A.] had on her right lower arm, around the wrist, she had linear and curvilinear marks and another mark that looked like it was in the shape of an L. . . . The left lower back she had another linear mark and the left buttock she had a linear mark, as well." Dr. Lanese testified that she recommended all three girls be "seen by a psychologist to determine the psychological effects of" the physical abuse which had occurred over the course of years.

Smith, who managed the girls' case, testified at trial. Smith testified that the photographs offered into evidence accurately depicted A.A.'s and C.A.'s injuries from the night of the incident.

A.A. and C.A. also testified at trial. F.A. did not. A.A. testified that her father frequently used physical forms of punishment when they broke his rules. A.A. testified there were a lot of house rules and it was hard to know what was expected of them at any given time because "even if [they] did something that [F.A.] didn't like, but he didn't explicitly tell [them] not to, it would suddenly like become like a rule."

During A.A.'s testimony, the judge sustained DCPP's objection to questioning by F.A.'s counsel as to whether C.A.'s beating was punishment for breaking the house rules as follows:

> [F.A.'s COUNSEL]: Your Honor . . . I'm asking questions as to whether or not they believe there was a rule broken in the house.
>
> THE COURT: What does it matter what she believes? She's already testified that she knew that there were rules and sometimes they were different each day and— it depended upon [F.A.'s] mood.
>
> [F.A.'s COUNSEL]: . . . I'm trying to ask questions about the specific event that occurred that night . . . . So, I'm just trying to . . . ask the witness if she believes on that particular night . . . that rule [was broken.]
>
> THE COURT: Yeah, I'm not going to allow you to do that. It doesn't matter what she believes. The objection is sustained. Move on.
>
> . . . .
>
> [F.A.'s COUNSEL]: Your Honor, I would just argue to the contrary. I believe it is relevant. It is relevant[.]
>
> THE COURT: Why?
>
> . . . .
>
> [F.A.'s COUNSEL]: The relevance is because if she believes the house rules were broken, then there may have . . . been a basis for the discipline in this case?
>
> THE COURT: Being hit by a belt?

11

[F.A.'s COUNSEL]: The . . . discipline in this case is what is at issue in this case. And, so the discipline has levels, and that is essentially what I'm trying to get testimony in regards to, whether or not there was discipline in this case. And, then argue as to the level of the discipline, as to whether or not it rises to the level of risk of harm to the children. That is what I'm trying to get at with these questions.

THE COURT: Well, first of all, the use of the word discipline is your word. . . . That's not a word that is a legal definition of what is alleged to have happened that night. All right. What this child believes about what the type of discipline that was going to be administered to her that night because she was on the phone . . . or whatever, has no relevance as to whether or not your client abused or neglected this child. The objection is sustained. Move on.

A.A. and C.A. both testified that the February 2021 incident was not the first time F.A. had punished them by physical force. Being forced to do strenuous physical exercises and being hit with a belt were common methods of F.A.'s discipline. C.A. testified that she had been hit with the same belt used in this incident "a couple times" before. Further, she explained the belt used for discipline was a "military belt," meaning that it was "not really leathery," but rather "really hard . . . harder than a leather belt," so "[i]t hurt[] more." C.A. had last been hit about a month prior to this incident, and in the past she had been kicked and choked until she was unconscious. She also testified F.A. had previously "hit [C.A.] and [her] sister with a belt" as punishment for having a

12

convenience store bag in their room. On that occasion, F.A. threw "everything out of [the] room in the front of the staircase," and "hit [them] with the belt a few times."

A.A. testified several months prior to the February 2021 incident, F.A. saw she had a photo of herself in a tank-top on her phone and learned that she had been texting during class. F.A. was angry about this and struck her on the bridge of her nose with her phone. Her nose was bruised and she felt "light-headed," so her father made her stand in the snow so she would not faint. She also testified that F.A. had previously threatened to "slam [their] head[s] through a wall" and used a dog leash to beat them. A.A. was not sure how many times her father had hit her in total but when she was hit to the point she thought she may pass out, her father would give her water and instruct her not to tell anyone else about the abuse.

B.A. did not testify at trial. However, she told DCPP and Dr. Lanese that she had been beaten by her father previously to the extent it hurt to sit down. DCPP's report recording B.A.'s statement is in the record before us.

At the conclusion of the hearing, the judge rendered an oral decision. The judge accepted the testimony of Dr. Lanese as credible. Although C.A. stated

she had "kind of suppressed [her] memories" of the incident, the judge found

that her testimony was credible, as was A.A.'s:

> I find these witnesses to be credible. It was striking to
> this court to watch them. It was on a video, but I could
> see them. I could hear them. I watched their demeanor
> throughout their testimony. . . . I'll [consider A.A.'s
> testimony] first.
>
> . . . . Her testimony had a ring of truth to it. She was
> consistent in her testimony today from what she told
> Dr. Lanese and what she told the [DCPP] worker . . .
> about what happened to her and . . . what happened to
> [C.A.]. . . .

The judge further found that A.A.'s testimony substantiated a pattern of

behavior common to much of the abuse F.A. inflicted. F.A. would take his

daughters into the basement where "no one will hear the screams," instruct the

girls not to tell others about the abuse, and offer them water or ice to prevent

them from passing out after he beat them. Additionally, the judge found that

A.A. had no motivation to testify untruthfully. Although there were moments

when A.A. seemed "upset," the judge determined her responses were

"appropriate," "consistent," and "direct."

The judge similarly found C.A.'s testimony credible. The level of detail

provided by C.A. gave the court insight into the situation as if the judge were

"in the same room as her" at the time of the incident as follows:

14

When she was describing, she said doing the crab walk. Like she was on her hands, on her feet, walking backwards to the point where furniture was upended and the rug . . . became in disarray, because later on he told her to clean it up. And, the reason why the living room was in disarray, is because she was backing up, a crab walk trying to get away from him, as he's swinging a belt at her.

Additionally, the judge noted that C.A.'s description of the belt F.A. used to beat her as "military" style indicated that it was a belt she was familiar with from prior abuse. C.A.'s testimony was consistent that A.A.'s, and the judge found that at the time of the incident, C.A. "needed to stop [the abuse] in some way" because "she was afraid her father was going to kill her." Specifically, the judge noted that C.A. did remember the details of the abuse, but found it painful to attempt to recall the incidences, setting forth:

[T]he terror that these children have been [subjected to] for years and years is evident to this [c]ourt. Because, they were able to recall specifics, and – and the way they talked about it, it was almost in a . . . nonchalant way. It was so common . . . but this night was different. And this night [this court] got the impression from [C.A.] that she had had enough. And, she was even willing to get her sister [A.A.] in trouble by ratting her out about the social media just so she would not be killed by her father. And when he was choking her with both of her hands, and she said she couldn't breath[e], and he said he was going to kill her, that is when everything got extra real for [C.A.].

. . . .

15

> . . . And it's clear to this [c]ourt that [DCPP] has proven by more than a preponderance of the evidence, but the standard is preponderance of the evidence, that [F.A.] has abused and neglected these children. . . .
>
> This is clearly, clearly excessive corporal punishment. To the point where you're beating your children with a belt, where you're slapping them, where you're choking them, and saying I'm going to kill you while you're choking them with both of your hands, while you're on top of [your] then I believe fifteen[-]year[-]old daughter is unconscionable. And this . . . case is so clear . . . with all of the evidence that's been presented . . . but most importantly with . . . the credible testimony of these children.
>
> So, for all of those reasons I do find a Title 9 against [F.A.]. [DCPP] has sustained its burden of proof.

The same day, the judge entered an order memorializing its finding that F.A. abused or neglected his daughters through excessive corporal punishment.

The judge conducted three compliance review hearings thereafter. R.S. filed a custody application in North Carolina and venue was transferred to North Carolina, where R.S. resided. R.S. was granted full custody of C.A. and B.A.

On October 12, 2022, the judge held a final hearing to dismiss the litigation as resolved at the request of DCPP, which was unopposed. Custody of C.A. and B.A. remained with R.S.[4] This appeal followed.

---

[4] As A.A. had turned eighteen during the pendency of the DCPP case, she was no longer a minor subject to the custody determinations of the court.

A-0927-22

On appeal, F.A. argues the judge's finding of abuse or neglect is unsupported by the evidentiary record. He asserts that C.A.'s testimony should not have been viewed as credible because she stated her memories of the February 2021 incident had been suppressed. F.A. further contends that the judge erred by not allowing his counsel to question his daughters as to whether they had broken the house rules through their use of electronic devices and social media. He argues that on the night in question, he was merely disciplining his daughters, therefore the judge improperly imputed harm to his daughters despite the sporadic and justified nature of his punishments.

Our review of the judge's finding of abuse or neglect is guided by well-established principles. "[W]e accord substantial deference and defer to the factual findings of the Judge if they are sustained by 'adequate, substantial, and credible evidence' in the record." N.J. Div. of Child Prot. & Permanency v. N.B., 452 N.J. Super. 513, 521 (App. Div. 2017) (quoting N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014)). "Indeed, we recognize that '[b]ecause of the [F]amily [Part's] special jurisdiction and expertise in family matters, [we] should accord deference to family court factfinding.'" N.J. Div.

of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (first alteration in original) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)).

However, we owe no deference to the judge's legal conclusions, such as the determination that a parent has abused or neglected their child under Title 9, which we review de novo. N.J. Div. of Youth & Fam. Servs. v. A.B., 231 N.J. 354, 369 (2017). "[DCPP] bears the burden of proof at a fact-finding hearing and must prove . . . harm . . . by a preponderance of the evidence." N.J. Dep't. of Child. & Fams., Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 22 (2013) (citing N.J.S.A. 9:6-8.46(b)). DCPP must sustain that burden "through the admission of 'competent, material and relevant evidence.'" N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 32 (2011) (quoting N.J.S.A. 9:6-8.46(b)). In making a determination of abuse or neglect, the trial court should base its decision on the totality of the circumstances. N.J. Div. of Youth & Fam. Servs. v. V.T., 423 N.J. Super. 320, 329 (App. Div. 2011).

"Title 9 controls the adjudication of abuse and neglect cases," M.C. III, 201 N.J. at 343 (citing N.J.S.A. 9:6-8.21 to -8.73), and was enacted "to protect children 'from acts or conditions which threaten their welfare.'" G.S. v. Dep't of Hum. Servs., Div. of Youth & Fam. Servs., 157 N.J. 161, 176 (1999) (quoting

State v. Demarest, 252 N.J. Super. 323, 330 (App. Div. 1991)). Under Title 9, an

> "[a]bused or neglected child" means a child less than [eighteen] years of age whose parent or guardian . . . (1) inflicts or allows to be inflicted upon such child physical injury by other than accidental means which causes or creates a substantial risk of death, or serious or protracted disfigurement, or protracted impairment of physical or emotional health or protracted loss or impairment of the function of any bodily organ . . . (4) <u>or a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of becoming impaired</u> as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care . . . (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, <u>including the infliction of excessive corporal punishment</u>; or by any other acts of a similarly serious nature requiring the aid of the court . . . .
>
> [N.J.S.A. 9:6-8.21(c) (emphases added).]

Parental rights include the right to take reasonable measures in disciplining a child, including corporal punishment. <u>N.J. Dep't of Child & Fams., Div. of Youth & Fam. Servs. v. K.A.</u>, 413 N.J. Super. 504, 510 (App. Div. 2010) (citing <u>State v. T.C.</u>, 347 N.J. Super. 219, 239-40 (App. Div. 2002)). The law does not clearly define what constitutes "excessive corporal punishment" because "[a]buse and neglect cases are generally fact sensitive.

19

Each case requires careful, individual scrutiny." P.W.R., 205 N.J. at 33. Proof of any injuries sustained by the child that are "of such a nature as would ordinarily not . . . exist except by reason of the acts or omissions of the parent or guardian" is prima facie evidence of abuse or neglect. N.J.S.A. 9:6-8.46(a)(2).

While "moderate correction" may be reasonable, "a single incident of violence against a child may be sufficient to constitute excessive corporal punishment." K.A., 413 N.J. Super. at 510, 511. Excessive corporal punishment may occur when "the child suffers a fracture of a limb, or a serious laceration, or any other event where medical intervention proves to be necessary . . . provided that the parent or caregiver could have foreseen, under all of the attendant circumstances, that such harm could result from the punishment inflicted." Id. at 511 (citation omitted); see also N.J.A.C. 10:129-2.2(a)(9) (listing "[c]uts, bruises, abrasions, welts or oral injuries" as injuries that may constitute abuse or neglect).

### III.

We begin by addressing F.A.'s contention the judge improperly found C.A.'s testimony credible despite her admission she had suppressed her memory of the February 2021 incident. F.A.'s argument as to this issue stems from C.A.'s

20

A-0927-22

response to a question on direct examination asking about the order of events when A.A. came downstairs. In response to that question, C.A. testified: "I'm not sure. Like this is a long time ago and I kind of really suppressed my memories. So, I'm not really sure what happened." However, when she was questioned further on cross examination as to whether "by saying [she was] suppressing, does that mean [she did not] remember everything that happened." C.A. responded: "No, just—I don't want to remember what happened."

The judge specifically addressed this issue and found C.A.'s testimony credible, setting forth as follows:

> When [C.A.] testified about suppressing the thoughts, it was so obvious to me—and she said it, she said it's not that I don't remember what happened, it's that I don't want to remember. Well, of course she doesn't . . . want to remember. She's a sixteen[-]year[-]old girl who's been putting up with these beating[s], as she called them, when he beats me, for years, and years, and years.

We "generally defer to the trial court's credibility determinations because the trial judge 'has the opportunity to make first-hand credibility determinations about the witnesses who appear on the stand' and thus 'has a "feel of the case" that can never be realized by a review of the cold record.'" N.J. Div. of Child Prot. & Permanency v. T.D., 454 N.J. Super. 353, 379 (App. Div. 2018) (N.J. Div. of Youth & Family Servs. v. E.P., 196 N.J. 88, 104 (2008)). F.A. has

21

proffered no case law to support his contention that we should disregard the judge's credibility determination regarding C.A.'s testimony, and we otherwise decline to do so. We add only that C.A. succinctly explained by using the term "suppressed" she found it painful and unpleasant to recall the details of her abuse, rather than being unable to remember.

IV.

Next, we consider F.A.'s assertion the judge incorrectly ruled that testimony from A.A. or C.A. as to whether they believed F.A.'s house rules had been broken on the night of the February 7, 2021 incident was not relevant. The judge sustained the objection to this line of questioning and set forth: "What this child believes about what the type of discipline that was going to be administered to her that night . . . has no relevance as to whether or not your client abused or neglected this child."

"As a general rule with respect to the exclusion or admission of evidence, we afford '[c]onsiderable latitude . . . [to a] trial court in determining whether to admit evidence, and that determination will be reversed only if it constitutes an abuse of discretion.'" N.B., 452 N.J. Super. at 521 (alterations in original) (quoting N.J. Div. of Child Prot. & Permanency v. N.T., 445 N.J. Super. 478, 492 (App. Div. 2016) (quoting State v. Kuropchak, 221 N.J. 368, 385 (2015))).

22

Pursuant to N.J.R.E. 402, all "relevant" evidence and testimony is presumed to be admissible at trial unless it is precluded by statute, Rule of Court or evidentiary standard. Evidence or testimony is considered "relevant" if it "ha[s] a tendency in reason to prove or disprove any fact of consequence to the determination of the action." N.J.R.E. 401.

F.A. asserts that A.A.'s testimony regarding whether C.A. was whipped with a belt and choked as punishment for breaking house rules is relevant under N.J.R.E. 401. F.A. contends this testimony would have bolstered his defense that the incidents leading to his arrest were part of reasonable discipline given his desire to keep his daughters from being exposed to dangers on the internet. Therefore, the testimony should have been admitted.

Because "[t]he law does not prohibit the use of corporal punishment," F.A. argues that this line of questioning is highly relevant to determining if his actions constituted abuse. T.C., 347 N.J. Super. at 239-40. New Jersey law "prohibits the infliction of <u>excessive</u> corporal punishment," but not non-excessive corporal punishment used as a means of discipline. Ibid. (emphasis added). "The general proposition is that a parent may inflict <u>moderate</u> correction such as is <u>reasonable</u> under the circumstances of a case." Ibid. (emphases added).

A-0927-22

Accordingly, in order for us to be persuaded by F.A.'s contention that testimony as to breaking house rules would have been relevant to the judge's fact-finding, we must determine there is any set of circumstances which would render a father choking and beating his daughters with a belt to be a reasonable form of punishment. F.A. proffers no case law to support such a conclusion. We are otherwise unconvinced.

In K.A., we concluded that the defendant mother, who punched her eight-year-old child with autism approximately four to five times in the shoulder after the child failed to follow directions, had not inflicted excessive corporal punishment under Title 9. 413 N.J. Super. at 506, 512. We found the defendant's actions were isolated and occurred during "the trying circumstances which [the defendant] was undergoing due to [the child's] psychological disorder." Ibid. The defendant showed remorse and took responsibility for her actions. "Out of sheer frustration, or through an ill-advised impulse, she struck her child five times. These blows, though undoubtedly painful, did not cause the child any permanent harm, did not require medical intervention of any kind, and were not part of a pattern of abuse."

We find the present matter distinguishable from K.A. F.A. maintained that he exercised appropriate discretion in the punishment he inflicted on his

daughters and has shown no remorse for his actions. Moreover, the credible testimony in the record established that F.A.'s actions on February 7, 2021 were not the result of heat-of-the-moment impulse, but rather part of a sustained pattern of inflicting serious physical abuse on his daughters under the guise of discipline. The judge set forth:

> [A.A.] is a child who is testifying about . . . how often . . . she had been abused by her father to the point where they all kind of knew what the deal was and what the drill was. [He] take[s] you into the basement, you can't be heard. [He] [g]ive[s] you ice or water so you don't pass out. [He] [h]it[s] you in a place where the bruises won't show. . . . [A.A.] knew that her sister was getting ready to be hit by a belt, because she had heard that sound before.

Accordingly, we find no error in the judge's evidential ruling. There is no basis for us to conclude that testimony regarding the act that allegedly led to the punishment would have been relevant to determining if F.A.'s methods of corporal punishment were reasonable under the circumstance. F.A.'s actions on February 7, 2021 were undoubtedly excessive corporal punishment that could not be justified under any factual scenario as a reasonable repercussion for a minor's use of an electronic device.

25

V.

We briefly address F.A.'s remaining arguments. First, F.A. contends the judge did not sufficiently consider that the February 2021 incident was isolated and not part of a repeated pattern of abuse. The record does not support this assertion and, instead, establishes F.A.'s continued abuse of the children for years. Moreover, in New Jersey, "a single incident of violence against a child may be sufficient to constitute excessive corporal punishment." K.A., 413 N.J. Super. at 511. Even leaving aside the evidence of continued abuse over a period of years, the record substantiates that F.A. choked his daughter until she was unable to breathe and beat two of his daughters with a belt over the course of several hours on February 7, 2021.

Finally, FA. argues the judge improperly presumed there had been harm done to his daughters based on their testimony. While it is true that in making a finding of abuse or neglect, the court "must avoid resort to categorical conclusions," this standard is applicable only when the child has not suffered "actual harm." Dep't of Children & Families, Div. of Child Prot. & Permanency v. E.D.-O., 223 N.J. 166, 180-81 (2015).

> Title 9 initially looks for actual impairment to the child.
> However, when there is no evidence of actual harm, the
> focus shifts to whether there is a threat of harm. Thus,
> a finding of abuse and neglect can be based on proof of

A-0927-22

imminent danger and a substantial risk of harm. Under those circumstances, [DCPP] must show imminent danger or a substantial risk of harm to a child by a preponderance of the evidence. Moreover, [c]ourts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect.

[Id. at 178 (first and third alterations in original) (citations and quotations omitted).]

At minimum, F.A.'s beating on February 7, 2021 caused C.A.'s eye to swell shut and A.A. had belt marks across her lower back. There was evidence of actual harm on prior occasions in that B.A. had previously been beaten to the point that it hurt to sit down, at the very least. We see no merit to F.A.'s argument that DCPP did not establish by a preponderance of the evidence his daughters suffered actual harm as a result of his actions.

We find no error in the judge's conclusion that, under the totality of the circumstances, F.A. abused or neglected A.A., C.A., and B.A., under Title 9. To the extent we have not already addressed them, any additional arguments F.A. raises on appeal lack sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-0927-22