# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3593-23

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

 Plaintiff-Respondent,

v.

L.A.,

 Defendant,

and

H.G.,

 Defendant-Appellant.

_____

IN THE MATTER OF
J.G. and Z.G., minors.

_____

Submitted October 21, 2025 – Decided December 5, 2025

Before Judges Sumners and Augostini.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Passaic County, Docket No. FN-16-0054-16.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Phuong Dao, Designated Counsel, on the brief).

Matthew J. Platkin, Attorney General, attorney for respondent (Sookie Bae-Park, Assistant Attorney General, of counsel; Lakshmi Barot, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minors J.G. and Z.G. (Meredith A. Pollock, Deputy Public Defender, of counsel; David B. Valentin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant H.G.[1] appeals from the trial court's order finding he abused or neglected his sons, J.G. (James) and Z.G. (Zane), pursuant to N.J.S.A. 9:6-8.21(c)(4)(b).[2] Because the judge's fact-finding decision was supported by sufficient credible evidence in the record and consistent with the applicable law, we affirm.

---

[1] We use fictitious names to preserve the privacy and confidentiality of the parents and children. R. 1:38-3(d)(12).

[2] The parties used different pseudonyms and fictitious names to refer to the children and included arguments regarding children that are not a party to this appeal.

## I

Defendant and L.A. (Leah)[3] are the biological parents of James, born June 1, 2015, and Zane, born October 3, 2018. Leah also has three additional children, I.S. (Ivy), born August 17, 2010, J.S. (Jennifer), born July 14, 2012, and M.A. (Mary), born January 18, 2014, who are not defendant's biological children.

Defendant's involvement with the Division began in 2013, due to allegations that he abused Maria, Jennifer, and Ivy. In October 2015, the Division filed for an emergency removal of Jennifer and Ivy from defendant and Leah's care, which was initially granted. The court later vacated the removal order and returned the children to defendant and Leah's care.

In October 2016, the Division filed an amended complaint for custody, and the court ordered the removal of James, Jennifer, Mary, and Ivy from defendant and Leah's care. In April 2019, the court reunited James, Jennifer, and Mary with Leah only, but kept Ivy in the Division's custody. The Division continued providing reunification services.

---

[3] The trial court also found that Leah abused or neglected her sons, but she does not challenge the court's order.

A-3593-23

Between June and November 2019, the Division received six referrals concerning defendant's conduct, culminating in the removal of the children and a Title Nine trial factfinding hearing on abuse or neglect allegations. The history of these referrals and the Division's determinations are as follows:

- May 21, 2019: An anonymous reporter claimed James had bruises on his face and arms that appeared to be "older and dark brown." He also appeared to have lost significant weight. Defendant denied any allegations of abuse.

- June 12, 2019: Mary alleged defendant hit her on the left side of her face, causing a bruise. Mary disclosed feeling unsafe at home because her mother and father hit her frequently. Jennifer corroborated Mary's story, noting that defendant hits her, James, and Mary. Defendant denied hitting Mary, claiming she hurt herself by falling over a toy but later contradicted himself by saying she "hurt herself with . . . a bike." When asked about the discrepancies in his answers, defendant digressed and changed the subject. The Division caseworker noted that James suffers from "speech issues" and was "nonverbal" in his interview. The Division investigated and determined the referral was not established.

- July 3, 2019: A camp director stated Mary claimed defendant hit her on the lip with his hand and saw that Mary's bottom lip had dried blood and "appeared to be split." Mary stated defendant hit her for not eating quickly and threatened to "cut her tongue off" if she did not eat. James corroborated this account, noting

that defendant stated "he would use a scissor to cut [her] tongue" because she wasn't eating fast enough. Defendant denied the allegations, stating that Mary had "dry lips" and alleged that Mary "would steal food and then would lie about it." The Division determined the referral was not established.

- July 29, 2019: Jennifer alleged defendant hit James for "eating an orange . . . and . . . [for throwing] it across the kitchen floor." The Division worker observed that James had a "black and blue" bruise on the corner of his left eye and a "coin-sized bruise." Mary initially claimed that defendant hit James in the eye but later stated that "she did not know what happen[ed] to [James]." Defendant denied the allegations, "stat[ing] that the mark [wa]s a result of [James'] eczema and [James] irritating it." The Division investigated and determined the referral was not established.

- September 18, 2019: Related information was conveyed to the Division stating that "[Mary] had had an open wound on her nose that appeared to be fresh but infected. It was circular and open like the inside of a popped blister; there-was puss." Mary stated that a bug bit her. After examining Mary, Dr. Maria Vasena, M.D., reported that the wound on her nose was from a burn. Mary noted that defendant "slaps" and "hits her with objects," and hits her and Jennifer "everywhere all the time." She claimed she was hit on "her face, back, butt and her legs." She also reported that defendant hit James and did not feed her or Jennifer. When James was asked about being hit and his parents, he "put his head down and

A-3593-23

remain[ed] quiet." Jennifer corroborated the abuse and said she "wanted to return to her resource home." Defendant denied the allegations, asserting the Division "convinces the children to lie against him" and "he feels like they're working against him."

- November 18, 2019: A referral noted that Mary's face was red from being hit and she did not attend school that day. The Division's caseworker observed a "wound on the top of her left cheekbone and then the rectangular mark on her right cheek." Mary said defendant slapped her across the face. Jennifer confirmed that defendant slapped Mary on her left cheek for "not sitting still on the couch" and hit her on the right cheek. Jennifer also stated that defendant had hit her with a belt two days ago, leaving a "black and blue" mark on her back. The Division subsequently removed Jennifer, Mary, James, and Zane from defendant and Leah's care. The Division sent the children to Audrey Hepburn Children's House (AHCH) for medical and psychosocial evaluations.

On November 21, 2019, the trial court granted the Division's demand for custody of Ivy, James, Jennifer, Mary, and Zane.

Between December 8, 2021 and August 17, 2022, the court conducted a Title Nine fact-finding trial. Division Caseworker Alba Tavares, Brett A. Biller, Psy.D, Mental Health Director at AHCH, and Marybeth Mariano, an advanced pediatric nurse practitioner at AHCH, testified for the Division.

6

Tavares testified regarding the Division's contact with defendant and the children. She detailed the referrals received by the Division concerning the children.

Dr. Biller testified in the place of AHCH social worker Joanne Glaser, who conducted Mary's evaluation but passed away before the trial. He testified to James' functioning and recommended treatment. He also testified to James' evaluation that was conducted by Dr. Michelle Ferrer, Ph.D.

Because Dr. Biller did not examine the children and was not present during their examinations, the court conducted a Rule 104 hearing to assess whether to exclude his testimony and the evaluations. Although Dr. Biller was not present in the room during any of the evaluations, he had personal knowledge of the evaluations through his supervision of the clinicians who performed those evaluations. His supervision included reviewing referrals, assigning cases to clinicians, leading team meetings after clinicians finished their evaluations, and approving the clinician's reports before they were finalized. Dr. Biller stated that he was not present in the room during any of the evaluations for this case.

Dr. Biller was qualified as an expert in clinical psychology, specializing in forensic child maltreatment. He testified as to the facts in the evaluation but

7

barred him from opining "as to any trustworthiness or change in demeanor or his own opinion as to the credibility of the child's statements" for James and Mary.  See N.J.R.E. 703; see also State v. Dishon, 297 N.J. Super. 254, 281 (App. Div. 1997) (noting that "an expert's testimony may be based on the work done or even hearsay evidence of another expert, particularly when . . . the latter's work is supervised by the former").  The court clarified that he may testify regarding a child's change of demeanor if the evaluator had informed him of the "line of questioning" or the report referenced the evaluator's "question and []answer format" that provided a clear basis for the child's change in demeanor.

Dr. Biller noted that he supervised the doctor who completed James' evaluation and discussed the evaluation with the doctor and others in case rounds before it was finalized.  Dr. Biller explained that his team didn't conduct a clinical interview for James because "it wasn't possible due to his presentation."  Instead, they used a child behavioral checklist, a self-reported questionnaire provided to a caregiver, to evaluate him.  Dr. Biller concluded physical abuse was clinically supported for James.  Dr. Biller relied on James' disclosures of inappropriate discipline, disclosures from his siblings, and

James' anxiety and attention difficulties that were consistent with children who have experienced physical abuse.

Dr. Biller diagnosed James with an adjustment disorder and recommended a child study team evaluation and a medical evaluation. He also expressed concerns regarding permanency, among other things. Notably, at the end of Dr. Biller's testimony regarding Mary's evaluation, the court stated that it had received a hotline call reporting that James had new injuries as a result of defendant's visitation.

Mariano testified regarding her examination of James, Jennifer, and Mary for possible abuse. The court qualified her as an advanced practice nurse specializing in pediatric abuse and child neglect evaluations. She examined the Division's referrals and screening summaries, court reports, and asked James about his medical history.

Mariano determined that James experienced eczema and hyperpigmentation. She noted that although parts of the hyperpigmentation were nonspecific, he had a pattern injury on his upper right thigh that presented as three parallel hyperpigmented lines. When asked about the injury on his leg, James stated: "Daddy popped me." Mariano further noted that this injury was unlikely the result of eczema, explaining that although eczema may

cause hyperpigmentation, it won't cause a scar. Because of the pattern injury and James' disclosure, Mariano concluded that this was a nonaccidental injury.

Mariano also noted that even without James' disclosure, she would have still expressed concerns for abuse because the shape of James' bruise resembled an object. Although she did not explicitly ask James or Maria whether they had been disciplined or physically abused, she noted that their injuries were concerning for abuse based on research showing that the cheek and thighs are not areas that are often injured in accidents. Accordingly, she recommended James for a psychosocial evaluation and that he cease contact with defendant.

The court issued an oral decision and written order finding by the preponderance of evidence that defendant abused or neglected James and Zane in accordance with N.J.S.A. 9:6-8.21(c)(4)(b).[4] The court emphasized the children's young ages, Mariano's testimony that some of the children's injuries were "nonaccidental," that "physical abuse was severe resulting in marks on the bodies," and that defendant used objects to hit the children. The court noted further that defendant's use of objects to hit his children was not

---

[4] On June 3, 2024, the court issued an order terminating the litigation because the Division had filed a complaint for termination of parental rights. The court ordered that the Division retain custody of James and Zane.

reasonable or proportionate, given that his justification was that "[Mary] stole food and . . . misbehaved." The court also pointed to Dr. Biller's testimony that the children's presentation was consistent with children who experienced physical abuse. Finally, the court dismissed defendant's contention that the children's references to "daddy" did not refer to defendant, noting that Tavarez confirmed that Mary referred to defendant as "daddy or papa."

Defendant appealed.

II

Our review of a trial court's finding of abuse or neglect is guided by well-established principles. We give substantial deference to the Family Part's factual findings if sustained by adequate, substantial, and credible evidence in the record. N.J. Div. of Child Prot. & Perm. v. N.B., 452 N.J. Super. 513, 521 (App. Div. 2017) (quoting N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014)). "Indeed, we recognize that '[b]ecause of the family courts' special jurisdiction and expertise in family matters, [we] should accord deference to family court factfinding.'" N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 343 (2010) (first alteration in original) (quoting Cesare v. Cesare, 154 N.J. 394, 413 (1998)).

11

However, "if the trial court's conclusions are 'clearly mistaken or wide of the mark[,]' an appellate court must intervene to ensure the fairness of the proceeding." N.J. Div. of Youth & Fam. Servs. v. L.L., 201 N.J. 210, 227 (2010) (alteration in original) (quoting N.J. Div. of Youth & Fam. Servs. v. E.P., 196 N.J. 88, 104 (2008)). We owe no deference to the trial court's legal conclusions, which we review de novo. Amzler v. Amzler, 463 N.J. Super. 187, 197 (App. Div. 2020); N.J. Div. of Child Prot. & Permanency v. D.C.A., 474 N.J. Super. 11, 24 (App. Div. 2022).

"The Division bears the burden of proof at a fact-finding hearing and must prove present or future harm to a child by a preponderance of the evidence." N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 22 (2013) (citing N.J.S.A. 9:6-8.46(b)). The Division must sustain that burden "through the admission of 'competent, material and relevant evidence.'" N.J. Div. of Youth & Fam. Servs. v. P.W.R., 205 N.J. 17, 32 (2011) (quoting N.J.S.A. 9:6-8.46(b)). In making a determination of abuse and neglect, the trial court should base its decision on the totality of the circumstances. N.J. Div. of Youth & Fam. Servs. v. V.T., 423 N.J. Super. 320, 329 (App. Div. 2011).

A parent subjects his or her child to abuse or neglect when:

> [the child's] physical, mental, or emotional condition
> has been impaired or is in imminent danger of being

12

impaired as the result of the failure of his parent or guardian . . . to exercise a minimum degree of care . . . (b) in providing the child with proper supervision or guardianship, by unreasonably inflicting or allowing to be inflicted harm, or substantial risk thereof, including the infliction of excessive corporal punishment. . . .

[N.J.S.A. 9:6-8.21(c)(4).]

Excessive corporal punishment isn't defined by the statute but is assessed on a case-by-case basis. N.J. Div. of Youth & Fam. Servs. v. S.H., 439 N.J. Super. 137, 145 (App. Div. 2015). "The term 'excessive' means going beyond what is proper or reasonable." N.J. Div. of Youth & Fam. Servs. v. K.A., 413 N.J. Super. 504, 511 (App. Div. 2010) (citing Webster's II New College Dictionary 390 (Margery S. Berube ed., 1995)). However, a parent "may inflict moderate correction" that is reasonable given the circumstances. State v. T.C., 347 N.J. Super. 219, 240 (App. Div. 2002). Furthermore, "a single incident of violence against a child may be sufficient to constitute excessive corporal punishment." K.A., 413 N.J. Super. at 511.

In K.A., we concluded that the defendant mother, who punched her eight-year-old autistic child approximately four to five times in the shoulder after the child failed to follow directions, had not inflicted excessive corporal punishment. Id. at 506, 512. We noted that the defendant's actions were

isolated and occurred during "the trying circumstances which [the defendant] was undergoing due to [the child]'s psychological disorder." Id. at 512. Notably, the defendant showed remorse and took responsibility for her actions. Ibid. We also emphasized that:

> [The defendant] was alone, without support from either her spouse/co-parent or from other members of her extended family, such as an experienced mother or aunt. Out of sheer frustration, or through an ill-advised impulse, she struck her child five times. These blows, though undoubtedly painful, did not cause the child any permanent harm, did not require medical intervention of any kind, and were not part of a pattern of abuse.
>
> [Ibid.]

### III

On appeal, defendant argues that the trial court: (1) lacked sufficient evidence to find that he engaged in excessive corporal punishment against James, and (2) erred in relying on Mariano and Dr. Biller's testimony as corroborating evidence. We are unpersuaded.

Defendant's contention that his use of physical punishment was not excessive is contrary to the record. The Division presented overwhelming evidence that defendant engaged in a pattern of physical abuse and used objects to hit James, causing scars and wounds on his face and legs, which is

14

sufficient to support a finding of excessive corporal punishment. His use of discipline was also disproportionate given the context: he slapped James for throwing an orange across the room, and split Mary's lip for not eating fast enough, adding that he would "cut her tongue off" if she did not eat.

The record supports the trial court's finding of abuse. The court properly found defendant's pattern of abuse was corroborated by credible testimony from James, his siblings, and the Division's experts. Both Mary and Jennifer corroborated James' abuse, noting that defendant hit James on a regular basis and slapped him for throwing an orange, and the caseworker's observations of black and blue bruises on James' face further corroborated the abuse. Mariano corroborated the abuse by finding that his leg injury appeared to have been caused by an object, and Dr. Biller noted that James's disclosures of abuse and his anxious presentation were consistent with children who had experienced abuse.

Defendant's contention that the trial court improperly relied on Mariano and Dr. Biller's expert testimony as corroborating evidence of abuse is without merit. They both relied on facts which are "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." N.J.R.E. 703. Moreover, they do not need personal or firsthand

A-3593-23

knowledge of an allegation because "an expert's testimony may be based on the work done or even hearsay evidence of another expert, particularly when, as here, the latter's work is supervised by the former." Dishon, 297 N.J. Super. at 281.

The trial court correctly relied on Mariano's expert testimony, corroborating the children's statement of abuse with direct evidence. See N.J. Div. of Child Prot. & Permanency v. A.D., 455 N.J. Super. 144, 157 (App. Div. 2018). For instance, her testimony corroborated James' abuse by noting that the shape of his bruise on his leg resembled an object, his leg injury was unlikely to be the result of eczema since eczema doesn't cause scars, and his disclosure that "daddy popped me." She also relied upon statements by Mary and Jennifer that defendant hit James.

Defendant's argument that Mariano failed to gather collateral information such as speaking with the children's pediatricians is unavailing. Her review of the Division's referrals and conversations with Tavares are sufficient to support her findings for abuse.

Likewise, defendant's assertion that Dr. Biller's testimony is insufficient because he did not interview nor see the children's demeanor is without merit. The trial court properly addressed this issue in its Rule 104 ruling, limiting Dr.

16

Biller's testimony to his personal knowledge of the abuse based on his supervision of the clinicians who evaluated the children.  He testified regarding the children's demeanors as documented in the clinicians' evaluations and merely reiterated the clinicians' findings that James' demeanor was consistent an abused child.  Accordingly, the trial court reliance on Dr. Biller's testimony was appropriate.

To the extent we have not already addressed them, any arguments defendant raised lack sufficient merit to warrant discussion in this opinion.  R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-3593-23